# WILLIAMS v. STATE.

No. A-11775. Sept. 2, 1953.

Rehearing Denied Sept. 30, 1953.

(263 P. 2d 527.)

John L. Ward, Jr., Tulsa, and Wallace & Wallace, Miami, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

BRETT, J. The plaintiff in error, James Elmer Williams, defendant below, was charged by information in the district court of Tulsa county, Oklahoma, with the crime of first-degree manslaughter. In said information it was alleged that the defendant took the life of James Marion Updike while engaged in the commission of a misdemeanor in that he drove his automobile while under the influence of intoxicating liquor without keeping to the right of the center of the highway, and did drive his automobile into the Updike automobile and as a result of the collision therewith, did inflict mortal wounds on James Marion Updike from which wounds he died. All the things alleged occurred in Tulsa county, Oklahoma, on the highway 2.6 miles south of the city limits of Tulsa, Oklahoma. The defendant was tried by a jury, convicted, his punishment fixed at three years in the penitentiary and judgment and sentence entered accordingly, from which this appeal has been perfected.

The record herein discloses that other than the occupants of the automobiles, the adult survivors of which were unconscious, there were no eyewitnesses to the collision between the defendant's automobile and that of the Updike automobile. It appears that prior to the fatal incident herein involved, the defendant on June 15, 1951, at about 5:00 a.m., picked up Leo Hardesty in Sand Springs, who was employed at the Wonder Bread Company in Tulsa. Hardesty related he was

given a ride to the bakery by the defendant, that the defendant drove from one side of the road to the other, and one time a bus had to stop for Dr. Williams to avoid a collision with Williams' automobile. He later testified that the doctor drove on the left side of the road much of the time. Hardesty related that Dr. Williams, whom he identified, drove about 15 miles per hour. He stated that the doctor told him he was a little bit tight, and he would let Hardesty out any time he wanted out. He further testified that Dr. Williams offered him a drink of whiskey out of a bottle he had laying on the front seat. He said that Dr. Williams inquired about a filling station since he was about out of gas, and the doctor told him he was going to Oilton, Oklahoma. He identified the car Dr. Williams was driving as a 1950 Pontiac two-tone in color.

Truman Donohoe, truck driver for Earl Bray Company, testified that he picked up a load of gasoline at a refinery and left about 5:00 a.m., that a car, driving very close to him, had passed him when he went through Red Fork. It was a two-tone Pontiac, he testified. He related that it swerved back and forth across the center line on the pavement. Donohoe said he was driving the gasoline truck about 25 miles per hour. He came upon the scene of the collision, and observed the two-tone Pontiac, which looked like the automobile he had seen.

Mrs. James Updike testified that James Marion Updike was her husband, that together with their son, on the morning of June 15, 1951, with Updike's mother, at about 5:30 a. m., they left Sapulpa going to Tulsa. She stated it was raining that morning, and she was riding in the front seat beside her husband with the son in the middle between them, and her husband's mother in the back. She admitted she was not observing the traffic, but that her husband was driving about 45 miles an hour and on the right side of the road, that a collision occurred, rendering her unconscious. When she regained consciousness, she observed their car with its back bumper against the Blue Haven Tavern on the east side of the road, Dr. Williams' car was on the west side of the road.

Mr. Jack Gott, a Tulsa police officer, testified that he was returning from Wichita Falls, Texas, that he came upon the scene of the collision, and observed the two automobiles, the Updike car and Dr. Williams' car with the doctor in it, that he stuck his head in the Williams' car and he could smell the odor of alcohol therein, but that he did not smell whiskey on the breath of the doctor.

Mr. Eakes testified in substance that he lived at Oakhurst, and was waiting at about 5:30 a. m. at the intersection of 57th street and Highway 66, about a half mile from the scene of the accident on the day in question. He related that a two-tone Pontiac passed him going toward Sapulpa, that wasn't being driven exactly straight, and it weaved across the road and back, though it was on the right side of the road.

Paul Weatherby, highway patrolman, testified that on the morning of June 15, 1951, after the collision, he saw Dr. Williams at the Osteopathic Hospital in Tulsa about 7:00 o'clock a. m. where he had a conversation with Dr. Williams. The attending physician granted permission for Mr. Weatherby to talk to Dr. Williams. Dr. Williams was conscious, and sitting on the bed, and he had a conversation with him. The trial court heard the evidence in relation to the conversation out of the hearing of the jury. After hearing testimony from several doctors as to Dr. Williams' consciousness part of the time in the early morning, and being otherwise satisfied of the voluntary nature of the conversation, Mr. Weatherby's evidence was admitted. Its admissibility is not under attack herein. Paul Weatherby testified he asked the defendant what he had been drinking, beer? To which the defendant replied, "No, whiskey". Weatherby related that he smelled a sour odor of intoxicating liquor on the defendant's breath. He

further testified that he left the hospital but had to return immediately to pick up something and the doctor was walking down the hall, unsteadily.

Mr. Decker, the highway patrolman who investigated the collision, testified to finding a whiskey bottle just outside the left-hand door of the Williams car. It was capped but empty, and there was a strong smell of intoxicating liquor on the defendant's breath.

The defendant contends it was reversible error to admit the whiskey bottle in evidence. This contention has been adversely determined to the defendant's position. All the foregoing evidence was admissible under the following authorities. In Nail v. State, 33 Okla. Cr. 100, 242 P. 270, 273, this court said:

"There was evidence of the manner in which the car was driven, and of bottles smelling of whiskey in the car driven by defendant, having a tendency to prove intoxication, and, while the evidence of the condition of defendant at the time she surrendered to the officers was remote, we think it was not erroneous; at least not sufficiently erroneous to amount to substantial prejudice. It was a matter proper to be submitted to the jury, and the remoteness in point of time goes rather to its weight than to its admissibility."

In Hall v. State, 80 Okla. Cr. 310, 159 P. 2d 283, 287, the collision occurred about 1:00 a. m. Therein in regard to the admissibility of evidence of the same character as herein involved this court said:

"Here the defendant is charged with reckless driving and certainly evidence of his condition, and to the finding of bottles of liquor under his truck and at the scene, were circumstances to be considered by the jury, and a part of the res gestae. The testimony of the witness Mrs. Ed Miller, who worked in the tavern at Hooker, that the defendant was in the tavern near 11 p. m., and was drunk at that time, and the evidence that soon after he left there, the collision occurred, was not so remote as to make this evidence inadmissible."

In Luellen v. State, 64 Okla. Cr. 382, 81 P. 2d 323, 329, this court said:

"The state's witnesses showed that his automobile zigzagged down the highway just prior to the accident, and to such an extent that it was necessary for them to stop their automobiles and attempt to leave the highway in order to avoid a collision. These were all proper facts to be considered by the jury, and it is not for us to say they came to the wrong conclusion."

There was evidence offered by the defendant to the effect he was not intoxicated. Doctors Ray and Martin testified they observed no evidence of the defendant's intoxication, and no smell of liquor on Dr. Williams. Dr. Martin testified he wasn't looking for it.

Myrtle Clark testified she operated a cafe in Oilton and the defendant was in her cafe until 2:45 a.m., that the doctor was in and out of the cafe answering calls, but that the doctor was not intoxicated and did not have any alcohol, and there was no evidence he was drinking at any time; he said he was going to Kansas City.

The defendant's denial consisted of his plea of not guilty. He did not take the stand in his own behalf, on the merits of the case. Under all the foregoing evidence on the issue of drunken driving, we are of the opinion it was entirely sufficient to establish the intoxicated condition of the defendant. The fact the evidence was conflicting on the issue of drunken driving presents no obstacle for it has been repeatedly held that, where there is competent evidence in the record from which the jury could reasonably conclude the defendant was guilty as charged, Criminal Court of Appeals will not interfere with the verdict even though there is a sharp conflict in the evidence and different inferences may be drawn therefrom since it is the exclusive province of the jury to weigh the evi-

dence and determine the facts. Sadler v. State, 84 Okla. Cr. 97, 179 P. 2d 479. But the issue of drunken driving alone does not determine the matter.

There remains the issue of whether the defendant's driving while intoxicated was the proximate cause of the collision, and the death of James Marion Updike. This court has held in cases similar to the one at bar that the question of proximate cause is one for the jury to determine from the evidence. In Chandler v. State, 79 Okla. Cr. 323, 146 P. 2d 598, 603, this court said:

"We are aware of the well recognized rule of law in civil cases that the question of proximate cause is generally a question for the jury. This rule of law also has application in criminal cases. * * *

"It has been universally held that a person may be found guilty of criminal homicide arising from the negligent operation of an automobile or its use for an unlawful purpose, or in violation of law, but it is uniformly held that it must be shown that such negligent operation, or use for an unlawful purpose or in violation of law, was the direct and proximate cause of death; that is, that there was a casual connection between the act and the death. 99 A.L.R. 772; Dunville v. State, 188 Ind. 373, 123 N.E. 689; People v. Barnes, 182 Mich. 179, 148 N.W. 400; Shaw v. Wilcox, Mo. App., 224 S.W. 58; State v. McIvor, 1 W. W. Harr, 123, 31 Del. 123, 111 A. 616; State v. Long, 7 Boyce, Del., 397, 108 A. 36; People v. Black, 111 Cal. App. 90, 295 P. 87; State v. Schaeffer, 96 Ohio St. 215, 117 N.E. 220, L.R.A. 1918B, 945, Ann. Cas. 1918E, 1137; Jackson v. State, 101 Ohio St. 152, 127 N.E. 870; Norman v. State, 121 Tex. Cr. R. 433, 52 S.W. 2d 1051; O'Mally v. Eagan, 43 Wyo. 233, 2 P. 2d 1063, 77 A.L.R. 582; Hiller v. State, 164 Tenn. 388, 50 S.W. 2d 225."

At page 339 of 79 Okla. Cr., at page 606 of 146 P. 2d, it was said:

"The proximate cause need not, of course, be shown by direct testimony; it may be determined from the circumstances in the case; but in view of the fact that the burden of proof rests upon the plaintiff, such circumstances must appear from the evidence."

Hence the burden to show proximate cause is on the state, but it may be determined not only from affirmative sworn testimony but also from circumstantial evidence.

Evidence of the proximate cause of the collision is found only in the testimony of Mr. Arthur D. Decker, highway patrolman, and circumstances surrounding the collision. Mr. Decker testified concerning physical facts present where the point of impact took place. He said that there were 38 feet of skidmarks that led to the center line on the east side of the pavement leading up to where there was a pile of debris, he related there were no skidmarks on the Williams side of the road up to the debris, but there were skidmarks on the pavement and shoulder and mailboxes knocked down from that point 165 feet southwest down the pavement and shoulder, where the Williams car was stopped. He stated that the debris at what appeared to be the point of impact consisted of dirt, pieces of chrome. glass of headlights, hood, ornaments and one hubcap; that this debris was approximately in the center line of the highway; however, he related debris was scattered all around for 150 feet. He described a mark or rent made by a wheel, "where it cut out a groove in the blacktop of the pavement, where the vehicle had gone in a kind of a bounce", that the groove was northeast of the point where the debris was in the center of the road, that the groove was 5½ to 6½ feet from the center of the highway east from the center line. He testfied he couldn't ascertain whether the groove mark was made by a right or left wheel of the vehicle. This groove was apparently made by the Updike car. He further stated he couldn't ascertain where the impact took place relative to the right or left of the center line, though he testified that, if the 38 feet of skidmarks were made by the rear wheels it was the Updike car that was across

the center line, but he then testified, that he could not tell whether the skidmarks were made by the front or rear tires. Hence this speculation as evidence was practically worthless. The jury was compelled to look to some other circumstance upon which to base a conclusion. The evidence further showed the impact on the Updike vehicle was from left of the center of the radiator in the front, and that the front of the Williams car and front wheels scraped it almost clear to the rear. State's Exhibits 1 and 2 being photographs of the highway and the wrecked automobiles were shown to the jury. The photographs clearly indicate that from the left half of the front grill or from the center of the radiator of the Updike car down the entire left-hand side was scraped, and crushed. The right side was not damaged. The patrolman testified that clear across the front of the Williams' car, such as the bumper, grill, radiator, hood, wheels and springs, was badly damaged. The photograph state's Exhibit 2 corroborates this testimony.

On cross-examination the witness testified that it had been raining off and on practically all night, that it was raining when he arrived, that the pavement was wet, it was blacktop, it was pretty slick. He further testified, that the location of the point of impact cannot be boiled down to a chemist formula, but that the 38 feet of skidmarks had been made when the brakes had been applied by the Updike car.

From the foregoing evidence the jury apparently concluded that the defendant in weaving down the highway on the slick pavement in an intoxicated condition lost control of his automobile, swinging it to the left with the front end in the path of the approaching Updike car so as to cause them to collide with all the front of the Williams car to the left of the center of the grill and radiator of the Updike car and thus crushing the Updike car from that point clear back to the left- hand rear of the said car. The evidence is sufficient to support this conclusion, particularly in view of the fact that Mr. Updike, apparently sober, was making every effort to control his car prior to the collision, and applied his brakes to avoid the obstacle in his path, while Dr. Williams, in an intoxicated condition, was apparently not conscious of any danger, and did not even apply his brakes. We are well aware, that the evidence on the issue of proximate cause is circumstantial, but we are of the opinion it creates a strong inference of guilt. In Rucker v. State, 64 Okla. Cr. 259, 79 P. 2d 629, 631, it was said in the body of the opinion:

"Where the evidence is circumstantial, and the circumstances are such as to reasonably justify the inference of guilt, the weight and value of such testimony are exclusively for the jury. It is only where the evidence obviously does not warrant the inference of guilt that this court will interfere. Otherwise the weight of circumstantial evidence, and the inference to be drawn from it, in almost every case, would finally be determined by the appellate court. We think a verdict of a jury based upon circumstantial evidence comes to us as any other verdict, and unless we can say that the inference of guilt drawn from the evidence is wholly unwarranted, we cannot interfere."

Such is the situation in the case at bar, the inference of guilt is warranted by the evidence herein. See also Morris v. State, 67 Okla. Cr. 404, 94 P. 2d 842. There being sufficient evidence reasonably tending to support the jury's conclusion on the question of proximate cause under the law, we are not at liberty to disturb the same. Furthermore, it has been held that in considering the sufficiency of all the evidence in a case, the function of this court is limited to ascertaining whether there is a basis in the evidence on which the jury can reasonably conclude that the accused is guilty as charged. Ray v. State, 86 Okla. Cr. 68, 189 P. 2d 620. The jury's verdict herein is predicated on such a basis. Hence the evidence on both the issue of drunkenness, and proximate cause is sufficient to sustain the jury's verdict.

It is next contended that the trial court erred in not instructing the jury as to the meaning of the term "under the influence of intoxicating liquor", and such failure requires a reversal of the case. To sustain this contention the defendant relies on Luellen v. State, 64 Okla. Cr. 382, 81 P. 2d 323 and Phenis v. State, 76 Okla. Cr. 156, 135 P. 2d 62. Both of these cases involve the charge of drunken driving. In the Phenis case, in syllabus 5, the law was announced that where the charge is driving a motor vehicle while under the influence of intoxicating liquor, it is the better practice for the court to define the term in his instructions to the jury. In the former Luellen case, in syllabus 4, this court said that such an instruction should be given in a drunken driving case, especially if requested by the defendant. We are of the opinion that where such is one of the issues in a criminal case, the better practice is to define the term, We believe the rule announced in the cases of Welch v. State, 43 Okla. Cr. 47, 277 P 280; Bruce v. State, 46 Okla. Cr. 214, 287 P. 809; Ware v. State, 47 Okla. Cr. 434, 288 P. 374, and Brown v. State, 51 Okla. Cr. 197, 300 P. 1001, relied on by the Attorney General, have been superseded by the better practice rule announced in Luellen and Phenis cases. But we know of no case holding in the absence of a request for the giving of such an instruction that it is error not to give it. The defendant herein made no request for such an instruction to be given. If the defendant's counsel thought such an instruction should have been given they should have requested it. The defendant had able counsel both of whom are well versed in the law and its practices. What we said in Wingfield v. State, 89 Okla. Cr. 45, 205 P. 2d 320, 331, seems applicable:

"It takes unfair advantage of the trial court and the State. It is an attempt to create a point by technical silence which if urged would be obviated and the technicality destroyed. Such conduct is similar to complaining about the court's failure to instruct on a certain feature of a case, without at the time of trial suggesting the necessity of such an instruction. This court has often said it will not permit that kind of contention to prevail. * * * We do not feel constrained to make of criminal procedure a game, where the trial court must match wits with the lawyers in an effort to ascertain hidden purposes, which they may not choose to disclose, in order to gain future advantage."

It has been repeatedly held by this court, if defendant's counsel is not satisfied with the trial court's instructions, which were given, and thought an additional instruction should be given, it was his duty to call the matter to the trial court's attention by a requested instruction. Cordonnier v. State, 86 Okla. Cr. 291, 192 P. 2d 298. It has further been held an omission of an instruction in the absence of a request will not constitute reversible error, Chapman v. State, 84 Okla. Cr. 41, 178 P. 2d 638, particularly unless the Criminal Court of Appeals believes in light of the entire record and instructions, the defendant was deprived of substantial justice. Fields v. State, 85 Okla. Cr. 439, 188 P. 2d 231. We do not believe that herein the defendant was deprived of substantial justice because of the failure of the trial court to instruct the jury on this issue, especially in the absence of a request.

Further, the defendant contends that there was no evidence of culpable negligence introduced at the trial and therefore it was error for the trial court to give an instruction on manslaughter in the second degree. The defendant asserts he objected to the giving of such an instruction. He relies for support of this contention on Ray v. State, supra. The rule therein stated and as predicated upon in an extended discussion, is as follows:

" 'Culpable negligence' is the omission to do something which a reasonable and prudent person would do, or the doing of something which such a person would not do under the circumstances surrounding the particular case.

"The driving of an automobile upon the highway with a degree of carelessness amounting to a culpable disregard of the rights and safety of others, and

thereby causing the death of another, establishes the crime of manslaughter in the second degree.

"Trial court did not err in submitting issue of manslaughter in the second degree as an included offense, even though information did not allege elements of manslaughter in the second degree where there was evidence from which the jury could reasonably conclude that defendant was giulty of culpable negligence in the operation of his automobile.

"One who is charged with manslaughter in the first degree under statute providing that one who kills a human being while committing a misdemeanor shall be guilty of manslaughter in the first degree may be found guilty of manslaughter in the second degree upon proper instruction, as an included offense, if facts justify. 21 O.S. 1941 § 711, subd. 1."

In the body of the opinion this court said the giving of such an instruction was a matter within the discretion of the trial court, which will not be disturbed on appeal in the absence of a clear abuse of discretion. Further therein, this court said:

"In view of the above authorities and in consideration of the facts in the instant case, it is apparent that the court acted correctly in submitting the included offense of manslaughter in the second degree to the jury."

Such is our conclusion on the issue herein. The charge in the Ray case was likewise manslaughter in the first degree committed by driving a motor vehicle while under the influence of intoxicating liquor. It is apparent that the Ray case does not support the defendant's contention, but rather sustains the contention of the state. See also Hall v. State, 80 Okla. Cr. 310, 159 P. 2d 283; Deberry v. State, 91 Okla. Cr. 399, 219 P. 2d 253, 254, wherein it was held:

"The driving of an automobile upon the highway with a degree of carelessness amounting to a culpable disregard of the rights and safety of others, and thereby causing the death of another, establishes the crime of manslaughter in the second degree."

The evidence herein of the defendant's condition and manner of driving indicated an utter disregard for the safety of others, amounting to culpable negligence as defined in Title 21, 716, O.S. 1951. We are of the opinion that substantial justice has been done, and for that and the foregoing reasons, the judgment and sentence herein imposed is accordingly affirmed.

POWELL, P. J., and JONES, J., concur.