**SMITH v. STATE.**

No. A-11917.

Criminal Court of Appeals of Oklahoma.
March 10, 1954.

Rehearing Denied May 5, 1954.

A. L. Commons, Charles F. Burns, Miami, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Owen J. Watts, Asst. Atty. Gen., for defendant in error.

POWELL, Presiding Judge.

Billy Wayne Smith was charged in the district court of Ottawa County with manslaughter in the first degree, growing out of an automobile collision on U. S. Highway 66 near the town of Afton, in said county. The accused had waived a preliminary hearing. The jury found appellant, who will hereinafter be referred to as defendant, guilty of manslaughter in the second degree, but were unable to agree upon the punishment, and left the same to the court, who sentenced the defendant to serve a term of eight months in the county jail, and to pay a fine of $1,000, and all costs.

For reversal counsel presents two general specifications of error:

(1) "The evidence is not sufficient to uphold the verdict."

(2) "Errors of law occurring at the trial."

As pointed out by counsel for the defendant, there was no contention, and no evidence to indicate that defendant's driving was influenced by the use of intoxicating liquor.

The charging part of the information involved reads:

"* * * said Billy Wayne Smith, then and there being, did then and there in the county and state aforesaid, on the day and year aforesaid, wilfully, unlawfully, knowingly, wrongfully and feloniously, without design on the part of the said Billy Wayne Smith to effect the death of one Judy Cordell Lancaster, while said defendant was engaged in the commission of a misdemeanor, to-wit: The crime of reckless driving as defined by Title 47, Section 121.3 of the Oklahoma Statutes Annotated, 1951, in the manner and form as follows, to-wit: That the said defendant, then and there being, did then and there, wilfully, wrongfully, recklessly, knowingly and unlawfully operate, drive and propel a certain motor vehicle, to-wit: a 1949 Cadillac Sedan attached to and towing a 1949 Ford Coach, said Cadillac Sedan bearing 1952 Michigan License Tag No. EG 28-64, from a point unknown to complainant to a point approximately one and three tenths miles east of the city limits of the city of Afton, Ottawa County, Oklahoma, on U. S. Highway 66, said highway running from Miami, Oklahoma, to Afton, Oklahoma, while negotiating a curve in said Highway and traveling in a westerly direction, at a greater rate of speed than would permit said defendant to bring his car to a stop within the assured clear distance ahead and without having due regard to the traffic, width and surface of said highway and to the other conditions then and there existing, did actually pass a motor transport truck and attempt to go around same without observing the approaching traffic from the other direction, also in violation of subdivision (e) of Section 121.4, Title 47 Oklahoma Statutes Annotated, and did then and there become involved in a collision with a 1949 Chevrolet Coach bearing 1952 California License Tag No. 3J4715, then and there owned and being driven and operated in an easterly direction by Elzy Robert Lancaster and did then and there, wilfully, unlawfully, wrongfully, negligently, recklessly and feloniously inflict certain mortal wounds upon the said Judy Cordell Lancaster, then and there riding in the automobile being driven by the said Elzy Robert Lancaster, her father, as a result of said automobile collision, of which mortal wounds, the said Judy Cordell Lancaster did, on the 13th day of July, die; contrary to the form of the statutes in such case made and provided, and against the peace and dignity of the State of Oklahoma."

The statutory provisions, Tit. 47 O.S.1951, § 121.3(a), and 121.4(e), forming the basis for the prosecution, read:

"§ 121.3 Speed—Reckless driving.
—(a) Any person driving a vehicle on a highway shall drive the same at a careful and prudent speed not greater than, nor less than is reasonable and proper, having due regard to the traffic, surface and width of the highway and any other conditions then existing, and no person shall drive any vehicle upon

a highway at a speed greater than will permit him to bring it to a stop within the assured clear distance ahead; and where any State or Federal Highway shall be under construction or repair, or a detour shall have been designated by reason of construction or repairs in progress, and the State Highway Department shall have determined a maximum safe, careful and prudent speed on such highway or detour, during the period of such construction or repairs, and shall have plainly posted at each terminous thereof and at not less than each one-half (½) mile along the route thereof, such determined maximum speed, no person shall drive any vehicle upon such portion of such highway, or upon such detour, at a speed in excess of the speed so determined and posted.

"§ 121.4 (e) No vehicle shall be driven to the left side of the center of the roadway in overtaking and passing another vehicle proceeding in the same direction, unless such left side is clearly visible and is free of oncoming traffic for a sufficient distance ahead to permit such overtaking and passing to be completely made without interfering with the safe operation of any vehicle approaching from the opposite direction, or any vehicle overtaken."

The violation of either of the above statutory provisions constitutes a misdemeanor. Tit. 47 O.S.1951, § 121.3(a) and § 121.4(e).

■■■ Considering the first proposition interposed, the record discloses that Elzy Robert Lancaster of California, who was visiting in Oklahoma, on July 9, 1952, was driving his 1949 Chevrolet coach from Tulsa to Fairland, where his father-in-law lived. A fishing trip had been planned. Two people besides Mr. Lancaster were riding in the front seat, but there were eight persons in the back seat, one or two being women, and the rest children. The evidence disclosed that Mr. Lancaster was driving 40 to 45 miles per hour and that while proceeding east on a long curve on U. S. Highway 66 he saw a transport coming toward him travelling west, and that as he met the transport and was about even with it, he saw a Cadillac car towing a Ford dart from behind the transport in an attempt to pass around it to the left of the transport, or south side of the highway, and that this situation arose suddenly and that in an attempt to avoid being run into Mr. Lancaster pulled to his right and got onto the shoulder of the highway three feet and eight inches off the slab, and that the Cadillac car driven by the defendant was driven further to its left and the left of the transport, off onto the shoulder of the highway and collided head on with the Chevrolet, and as a result of such accident Judy Cordell Lancaster, age four years, met her death.

The State established the above evidential summary by the testimony of Elzy Robert Lancaster, father of the deceased child and driver of the Chevrolet, and by Margaret Jewell Lancaster, his wife who was a passenger in the Chevrolet; by Gerf Rogers, the father-in-law of Mr. Lancaster, and who was riding in the middle of the front seat of the Chevrolet; and by J. D. Whitlock, driver for the Roadway Express Corporation and who was driving west along the highway at the time, and behind the defendant. Whitlock was an eye-witness to the tragedy, and observed defendant pass by the vehicle of witness and attempt to pass the transport up ahead, pull back, and as the transport was going around a curve, observed defendant a second time start around the transport, and seconds later witnessed the collision. At the scene of the tragedy witness heard the defendant in conversation with Mr. Lancaster, driver of the Chevrolet, say to him: "I tried every way in the world to miss you, but I did not see you."

Officer Bert George, Highway Patrolman, testified that he reached the scene of the collision in question soon after it happened and talked with the defendant, who told him that he had been the driver of the Cadillac which had towed a 1949 Ford; that he explained what happened as follows:

"* * * He stated that he was traveling south on 66 and was passing a truck-trailer, that he didn't notice the 1949 Chevrolet approaching until he was on up about even with the tractor of the truck and noticing that it was

coming toward him that he pulled to his left to·enable the 1949 Chevrolet to continue on, but that the Chevrolet also cut to the right or on the same shoulder and that they hit over there."

The State introduced a number of pictures showing the roadway at point of impact, and the cars involved in the collision.

The defense offered a number of leading citizens of Durant, Oklahoma, to show that the defendant was a school boy 18 years of age, and had the reputation there of being a peaceable and law-abiding citizen.

James L. Smith, Jr., testified that he was 26 years of age, lived in Durant but was engaged in transporting automobiles from Detroit, Michigan to various parts of the country; that his 18-year old brother on the day of the collision in question was driving a Cadillac and towing a Ford. Witness was also on the highway a short distance ahead of the defendant and was driving a motor vehicle, which was towing a second vehicle. He saw the dust caused by the collision and turned around and drove back to the scene. He stated that there were no marks or signs to establish the point on the highway where his brother attempted to pass the auto convoy vehicle as a no-passing zone. Witness identified various pictures of the vehicles.

On cross-examination witness was asked:

"Q. Mr. Smith, were you present about, or following after the accident in the John Hospital in Afton when your brother engaged in conversation with one of the Highway patrol, a Mr. Lowrey? A. I believe I was.

Q. Isn't it true that your brother, Billy Wayne Smith, told the Highway Patrolman, Mayes Lowrey, 'I am guilty, that is all there is to it', and isn't it true you said, 'Shut up'? A. I don't remember that."

Witness would not categorically or positively deny that the above happened. His answers continued to be that he did not remember or recall.

The defendant testified, and his explanation of what happened was as follows:

"Q. Little boy, you tell what happened before you got to the overpass in your own words, take your own good time. A. Well, we, me and my brother were both north of the overpass, I would say, about, approximately, I am not too good at guessing distance, but I would say four miles. My brother and me passed the Roadway, he gave us the clear signal and we went around before we got to the overpass, then we came upon this Auto Transport and my brother passed him, and I started to go around, there was a no-passing zone there, so I pulled back in and I waited and when I got over the overpass I thought the coast was clear and it was a passing zone so I attempted to go around the transport and I seen this 1949 Chevrolet coming towards me and I immediately slowed down my automobile and I stopped just as quick as I could. I nearly came to a complete stop on the left side of the highway, east side of the highway and Mr. Lancaster hit me, I was going in a westerly directly and he knocked me back east so I would say he was going a good 50 miles an hour. I then got out of my car and assisted Mr. Lancaster and all his family, doing everything I could to help them because I knew they needed it, I wasn't hurt bad but I knew they did."

Mayes Lowrey, highway patrolman, on rebuttal for the State testified that after the accident, in conversation with the defendant in the presence of James L. Smith, Jr., that defendant stated: "I am guilty and I might as well admit it", and that James L. Smith admonished defendant to be quiet, or shut up.

Defendant on rebuttal positively denied that he told Highway Patrolman Mayes Lowrey that he was guilty or that his brother had admonished him to keep quiet, or shut up.

It is at once apparent from the partial summary of the evidence above, that there was sufficient evidence in the record to support the charge set out in the informa-

tion, which was founded on Tit. 47 O.S. 1951 §§ 121.3(a) and 121.4(e). We have many times said that where there is competent evidence in the record from which the jury could reasonably conclude that defendant was guilty as charged, that this court would not interfere with the verdict, even though there is a sharp conflict in the evidence, and different inferences might be drawn therefrom, since it is the exclusive province of the jury to weigh the evidence and determine the facts. Williams v. State, Okl.Cr., 263 P.2d 527; Chapman v. State, 84 Okl.Cr. 41, 178 P.2d 638; Sadler v. State, 84 Okl.Cr. 97, 179 P.2d 479; Brown v. State, 92 Okl.Cr. 448, 224 P.2d 614.

■ In support of the contention that there were errors of law that would entitle defendant to a reversal, it is argued, among other things, that the testimony of Bert George, highway patrolman, was incompetent in that he arrived at the scene of the collision herein involved after it happened, and it is claimed that he was permitted to give his opinion as to how the accident happened. The case of Maben v. Lee, Okl., 260 P.2d 1064, is cited as supporting defendant's contention. We do not find the case to be in point. We do not find from the testimony of this witness that he expressed an opinion as to the guilt or innocence of the defendant, or that his testimony constituted hearsay. This witness merely testified to the physical facts in relation to skid marks of the respective vehicles involved, identified certain photographs of the vehicles and the highway at point of impact between the cars, and testified as to voluntary statements made by the defendant soon after the accident.

Defendant complains of the failure of the trial court to give certain requested instructions. It is claimed that the jury was not instructed on defendant's theory of the case.

The requested instructions mentioned are as follows:

"No. 1. Gentlemen of the jury you are instructed to return a verdict of not guilty.

"No. 2. Gentlemen of the jury you are instructed that if the defendant was confronted with an emergency and used his best judgment under the then existing circumstances and had no criminal intent to injure or harm any person or their property your verdict should be for the defendant.

"No. 3. Gentlemen of the jury you are instructed that when one is confronted with a sudden emergency if he acts and conducts himself as a reasonable and prudent person would do under like circumstances he would not be guilty of any offense.

"No. 4. Gentlemen of the jury you are instructed that if you find and believe from the evidence in this case that the defendant had no intention to harm the deceased you should take the same into consideration."

The instructions submitted, of course, related to the conduct of the driver of a motor vehicle in a sudden emergency and concerning the question of intent.

The court gave consideration to the statutory provisions heretofore quoted, Tit. 47 O.S. 1951 §§ 121.3(a) and 121.4(e) and gave, among others, the following instruction:

15. "A driver of an automobile in a sudden emergency may act in good faith according to his own best judgment and he would not be held responsible for an error in judgment, provided he acted in a reasonable manner under the circumstances at the time of the emergency, unless the emergency itself has been brought about by some negligent act or acts on the part of the driver of the car, and if the driver of the car by his own negligent acts brought about the emergency, this rule does not apply."

■ Concerning intent, under the circumstances as in this case, this court has previously treated the question in Winkler v. State, 45 Okl.Cr. 322, 283 P. 591; Lamb v. State, 70 Okl.Cr. 236, 105 P.2d 799; and Beck v. State, 73 Okl.Cr. 229, 119 P.2d 865, 866. In the latter case, we said, paragraphs 4 and 5 of the syllabus:

"Where the intent with which an offense is committed is an essential ele-

ment of such offense, the operating of an automobile by a person charged with an offense in a manner forbidden by law takes the place of and supplies the unlawful intent. It then becomes a question of fact whether or not defendant at the time was guilty of culpable negligence in operating an automobile upon the highway in violation of the law.

"While it is the duty of the courts to guard the rights of every defendant charged with crime and to give him the full benefit of every reasonable doubt of his guilt when tried for crime, it is equally the duty of the courts to protect the traveling public against reckless, wanton, wilful, and unlawful conduct of drivers of automobiles over the public roads of the state."

In the Lamb case supra, we defined culpable negligence as follows [70 Okl.Cr. 236, 105 P.2d 803]:

" 'Culpable negligence' is the omission to do something which a reasonable and prudent person would do, or the doing of something which such a person would not do under the circumstances surrounding the particular case."

We have examined the record herein very carefully, paying particular attention to the rulings of the court and the instructions requested and the instructions actually given. The record discloses, like the majority of criminal cases, a tragedy. The defendant was shown to have an excellent reputation in the community in which he lived for truth and veracity. He was only 18 years of age at the time and had never before been charged with any offense. Some of the most substantial citizens of Durant testified in his behalf.

But the evidence supports the crime with which defendant was charged, and which resulted in the death of Judy Cordell Lancaster. The jury might have found the defendant guilty of manslaughter in the first degree, Tit. 21 O.S. 1951 § 711(1), which would have supported punishment at confinement in the State penitentiary of not less than four years to life. But he was found guilty of manslaughter in the second degree, Tit. 21 O.S. 1951 § 716, which carries a penalty of confinement in the State Penitentiary of not more than four years, or not less than two years, or by imprisonment in the county jail not exceeding one year, or by a fine not exceeding one thousand dollars, or both such fine and imprisonment.

The jury could not agree upon the punishment to be assessed. The court no doubt by reason of leniency in the matter of the assessment of punishment, gave due consideration to all matters favorable to the defendant, except that the defendant being a school boy and apparently not a person of means, was assessed a maximum fine, which is out of proportion to the amount of imprisonment assessed, and this court, after careful consideration, has concluded that the fine should be modified from one thousand dollars to five hundred dollars.

With this modification, there is nothing presented that would justify further modification or the granting of a new trial. Public officials must perform their duties, regardless of how much they may sympathize with the one who is convicted. But for the defendant's negligent driving, the tragedy could not have occurred.

The judgment appealed from as modified is affirmed.

JONES and BRETT, JJ., concur.