Roy CROSSETT, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A-12272.

Criminal Court of Appeals of Oklahoma.

Sept. 5, 1956.

Rehearing Denied Oct. 17, 1956.

Hal Welch, Hugo, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

POWELL, Judge.

The within case is here on appeal for the second time. See Crossett v. State, 96 Okl.Cr. 209, 252 P.2d 150 for legal propositions there treated and settled.

The crime charged was manslaughter in the first degree. On the within trial the jury returned a verdict of "Guilty of manslaughter in the second degree", and defendant's punishment was fixed at. six months imprisonment in the county jail, and to pay a fine of $1,000. For reversal four assignments of error are advanced and argued. We shall treat the assignments in the order presented.

The first assignment is that the evidence was insufficient to support the conviction of manslaughter in the second degree. The verdict being based on the included offense of manslaughter in the second degree, indicates that the jury, only found the defendant guilty of culpable negligence in the operation of his automobile at the time of the collision, so that detailed evidence concerning the alleged intoxication of the defendant is not called for in a consideration of the sufficiency of the evidence to support the verdict and judgment rendered.

The evidence discloses that Roy Crossett, hereinafter referred to as defendant, on the night of December 12, 1950 was driving a black Buick sedan over U. S. Highway 70 in a general westerly direction at about 9:30 p. m., when his automobile collided with a Ford automobile being driven in a generally easterly direction by the deceased, Bob Andrews, over the same highway and at a point about six-tenths of a mile west of Hugo and 127 feet east of the driveway of the Circus Drive-In Theatre, located on the north side of said highway.

The defendant was 62 years of age at the time of the collision. The deceased was a high school boy 16 years of age, who lived in Hugo with his aunt, Mrs. June Blakely. She testified that the Ford her nephew was driving belonged to her. He had obtained a driver's license October 15, 1950, about two months prior to the accident. The deceased, a short time before the tragedy, had driven to a residence just west of the Circus Drive-In Theatre to return a coat to a girl friend.

The evidence on the part of the defendant, as developed from witnesses Robert Firebaugh and Dr. John Wyche, directors of the Citizens State Bank of Hugo, was to the general effect that the defendant, Crossett, had come from his home in Soper on the afternoon of December 12 to attend the annual meeting of the Board of Directors; that after the meeting broke up the defendant, Roy Crossett, Dr. Wyche and Mr. Firebaugh rode in the automobile of Firebaugh to the Chevrolet Motor Company where Mr. Crossett had parked his automobile. Crossett and Dr. Wyche got into the Buick automobile and drove about two blocks to the office of Dr. Wyche, a dentist with offices in the city of Hugo.

The defendant testified that after the meeting of the Board of Directors of the Bank he went to the Chevrolet Motor Company where he got his car, driving in company with Firebaugh and Dr. Wyche, and then immediately drove in the city of Hugo opposite the office of Dr. Wyche where he parked his car, and went with Dr. Wyche to his office for a short time, and on leaving that office they separated. The defendant stated that he then went to a nearby picture show. Defendant said that he lived alone in the town of Soper and that he was a regular attendant at picture shows; that after attending the show he got in his car and drove to a place called The Tavern, located on U. S. Highway 70 within the city limits of Hugo, where he drank a bottle of 3.2 beer; that

he purchased two quarts of beer to take home with him. He placed the two bottles in the front seat of his car. He then left for Soper, driving west along U. S. Highway 70, as recited.

Travis Edsel Griffin testified for the State that he lived three miles west of Hugo and that on the night of December 12, 1950 he was returning home from a picture show and heard a collision ahead and saw people in front of a grocery store looking west. He drove on west to a culvert east of the drive-in theatre and observed two automobiles that had been in a collision. He saw the defendant Crossett in one of the cars, propped up on an elbow. He said defendant's car was pointed northwest with the back wheels on the south side of the road, and there was just enough room for a truck of lumber to pass between the back of defendant's car and the guard posts on the culvert. Witness began flagging down cars to prevent a pile-up. Two highway patrolmen soon arrived and took charge.

Witness said that the Bob Andrews car was on the north side of the road on the shoulder, the two right wheels being on the pavement and the two left wheels on the shoulder of the road, and west of the culvert. He said the steering wheel was mashed against the driver, Bob Andrews, who was unconscious.

Cecil Snapp, State Highway patrolman, was called to the scene of the collision. He thought he got there about 9:15; other witnesses said the collision took place at 9:30. A second patrolman, Earl T. Wade, said it was 9:50 when he and Snapp arrived at the scene.

Officer Snapp testified that when he and officer Wade got to the scene two men were flagging cars; that he and Wade lighted and placed torches; they then observed defendant in the front seat of his car; they observed one bottle of beer in the front and one bottle had been broken and spilled on the front seat. The cap was intact on the neck of the bottle. They placed defendant in the patrol car. He said that defendant answered that he did not believe he was hurt, but witness observed a little blood on his hand and they took him to the Memorial Hospital at Hugo, where the evidence shows he was confined by reason of shock for twenty-four days.

Inasmuch as officer Snapp's testimony covering the physical evidence of the impact between the automobiles involved is substantially as that of officer Wade, we will quote officer Wade, who testified from his notes.

Patrolman Earl T. Wade testified that he arrived at the scene of the accident, as shown by his notes made at the time, at 9:50 the night of December 12, 1950; that patrolman Snapp accompanied him, and they investigated the case together. As to the discernable physical facts concerning the impact between the two vehicles at the scene, this officer testified:

"Q. Would you describe to the jury with reference to the south and north sides of the highway from the center line where you first saw tire marks made by Mr. Crossett's car, did you trace those with reference to this point until they reached where Mr. Crossett's car was sitting at that time? A. The first tire marks that appeared were made by the left side of Mr. Crossett's car. They first appeared two feet south of the center line, and those continued west in a circular motion. They first were going slightly southwest, then gradually curved back to the northwest.

"Q. You say that the left tire marks when you first detected them were approximately two feet south of the center line? A. Yes sir.

"Q. As you traced them on in a southwest direction, how far did they go with reference to the center line or on the south side of the highway? A. The farther west it went the nearer they came to the south edge of the pavement.

"Q. Do you know how close they came to the closest point? A. The

closest point was 22 inches to the south edge.

"Q. That was which side going west? A. To a car going west it would be the left.

"Q. Left of the center? A. Yes sir.

"Q. When you determined the point of impact how did you arrive at that point of impact? A. When the cars collided the right front tire of Mr. Crossett's car was blown out and either the rim or some projection underneath the car struck the pavement and dug a shallow trench in the asphalt, and it was from that point that we established the point of impact.

"Q. Do you know how far it was from that point where it dug into the asphalt where you determined the impact to be, from that point to where Mr. Crossett's car was? A. From that point to where Mr. Crossett's car was, was 18 feet.

"Q. Where with reference to Mr. Crossett's car was it to the car Bob Andrews was driving? A. It was northwest of Mr. Crossett's car.

"Q. Do you know how far? A. 17 feet.

"Q. Were you able to trace any physical evidence as to where the Andrews car was immediately before the point of impact? A. No, sir, there was no evidence of where it was before the collision.

"Q. You did not trace the Andrews car back by tire marks, is that correct? A. That is correct.

"Q. Was there evidence as to the point or route the Andrews car travelled from the point of contact to where it stood when you were out there? A. Yes, sir.

"Q. Describe what evidence there was to that effect and how you arrived at it when the collision occurred. A. When the collision occurred the Andrews car was forced side-wise in a

northwest direction and the tires from the Andrews car left marks on the pavement when it skidded side-wise."
* * *

"Q. What part of Mr. Crossett's car came in contact with the Ford? A. The right front.

"Q. The right front corner? A. I would say the bulk of the collision was on the right.

"Q. The right front fender? A. Yes sir.

"Q. Where was the point on the Ford that the right front corner of the Crossett car struck the Ford? A. Between the front of the right door and the right front of the car."

The defense produced as a witness Tommy Hider whose testimony had played an important part in causing a reversal of the conviction at the first trial. He testified substantially as he did at the first trial, with two notable exceptions. He said in the first trial that as he slowed up to turn in to his brother's cottage at the West End Grocery, which was a short distance east of where the accident involving defendant took place, he observed a car approaching from the rear and that such car went around him and on west; that he saw no lights from any car approaching from the west. He turned in the driveway to his brother's home and a few moments later heard a crash. This time witness swore that a Buick car approached him as he turned in to his brother's at a speed so fast that he noticed the car was a Buick but that he had turned into his brother's before the Buick went by and that it went by on the right hand or north side of the road. Witness admitted that his testimony at the first trial was different in the respects stated.

The defendant testified as to his age and said that he was in his sixty-eighth year. He said that close to nine o'clock the night of December 12, 1950 he drove in his automobile west along U. S. Highway 70 towards Soper. He was asked:

"Q. Tell the jury what occurred as you saw it. A. Well, I was driving home, I got out to the edge of town, I passed a car that was slowing up to turn off, I passed around this car and was getting back to my side of the road, all at once a reflection of light on something came in my view and for self-preservation I tried to get out of the way. I first turned to the left when I saw it coming to get out of the way. I saw it turn to the left, and I turned to the right, and it did too, and we had a collision.

"Q. It is the testimony that the left front wheel of your car, right at the culvert, it is the testimony from the patrolman that the left front wheel of your car came within 22 inches of this south edge of the pavement, about even with the culvert that is represented by the stakes there. How did you happen to drive your to that point? A. In order to get away from him heading right to me.

"Q. Where was the car when you made the lefthand swerve? A. I couldn't tell, it was not too far. He was on the right-hand side, my right hand side.

"Q. When you swerved this way what happened to the car approaching you? A. He turned back then himself and I did too. I turned back just as he did. He turned back.

"Q. Would you say both cars were turning north when they ran together—when they came together? A. That is the way I saw it.

"Q. Both turned to the south and both turned to the north? A. Both turned north.

"Q. What happened to you as a result of that collision? A. My chest was crushed, my knees injured, and hands.

"Q. What shape did it leave you in after the collision of the cars? A. I was in terrible shape.

"Q. Did you realize clearly what happened immediately after that? A. No, sir.

"Q. There has been testimony here that you mumbled and were unable to walk steadily on your feet. Do you know whether that is true or not? A. I don't know.

"Q. If that is true, was that caused by an intoxicant you had drunk? A. No, sir.

"Q. What was your condition as to being drunk or sober immediately at the time of your driving your car on that road? A. I was sober. I had that drink in the bank and one bottle of beer.

"Q. That was all you had had? A. That was all I had.

"Q. Did you later learn that one bottle of that beer was broken in the car? A. Yes, sir.

"Q. I believe you said the bottles were up in the seat of the car together? A. Yes, sir.

"Q. Do you know whether you got any of that beer on your clothes or not? A. I am sure I did. They were sitting in the seat by the side of me.

"Q. How long did you remain in the hospital after the wreck? A. Twenty-four days.

"Q. There is testimony in the record that on the 14th day, that would be the second day after this wreck, that you had a fainting spell in the hospital. Under what circumstances did that occur? A. The technician and a nurse started to take me to the X-ray room and the pain was so intense from my crushed chest that I blacked out and became unconscious.

"Q. What ever occurred to your chest did that occur in this accident? A. Yes, sir."

Thomas Strong, who did not testify in the first trial, was called as a rebuttal witness for the State. He testified that he

lived a mile and a quarter west of Hugo on Highway 70; that shortly before the collision he was near the highway in front of his house. The collision occurred east of his home on the highway. He lives about a quarter of a mile west of the drive-in Theatre and west of the home of the young girl the deceased had driven to just prior to the accident. He testified that immediately prior to the collision he saw a car going east on Highway 70; the lights of the car were on, and the car was light colored, and from the sound of the motor he took it to be a Ford. The car was travelling east toward Hugo and in the direction of the drive-in theatre and at a speed of 30 to 40 miles per hour. Witness said that the car was travelling on the south side of the highway, or on the right side going east. He testified that he started to his garage and had not walked very far when he heard the screeching of the tires and the crash of the two cars when they came together. He got in his car and immediately drove to the scene of the collision. He said that no other cars had passed along the highway in front of his house between the time the Ford passed going east and the time he heard the crash of the two cars at the place of the collision.

On cross-examination witness testified that the car he saw at the scene of the accident was the same car he saw passing along the highway shortly before he heard the sound coming from the place of the collision.

From a consideration of the above evidence it is seen that just preceding the collision between the Buick driven by the defendant, and the Ford driven by the deceased, the physical signs show that defendant's Buick was at least partially on the south side of the highway as he drove west, the wrong side. He attempted to explain this by saying that just prior to the collision he had pulled into the left lane of the highway in passing the Hider car, though Hider had changed his evidence since the first trial and said that he pulled off the highway before the Buick car reached the drive where he turned in, and

that defendant's Buick was driven straight ahead. The defendant's contention was that he was momentarily blinded by the light of a car coming from the north side of the highway from the direction of the entrance to the drive-in theatre and into the north lane of the highway, and then into the south lane. Defendant said he tried to get out of the way, first turning to his left, then when that car turned into the left lane he turned right, and the Ford was also turned back north, and the collision resulted. But there was the evidence of the rebuttal witness, Thomas Strong, that moments prior to the collision the deceased was driving east on the south side of Highway No. 70, towards Hugo.

The evidence presented a question of fact for the determination of the jury. The issues were fairly presented to the jury. In fact, on this trial the instructions given were most favorable to the defendant. The jury, while rejecting the charge of driving while drunk (and it must be said that although there was conflict, the evidence as to such issue was sufficient for submission of the question to the jury), did believe that the defendant was culpably negligent in his driving. There was a conflict in the evidence, as to that question, but this court is committed to the well known rule that a jury's determination upon a conflict in the evidence must be controlling, and unless there are errors of law appearing in the record a jury's finding of guilt will be sustained on appeal where there is competent evidence to sustain the finding. Sadler v. State, 84 Okl.Cr. 97, 179 P.2d 479; Campbell v. State, Okl.Cr., 280 P.2d 758; Williams v. State, 97 Okl.Cr. 229, 263 P.2d 527; Anson v. State, Okl.Cr., 269 P.2d 383; Beavers v. State, Okl.Cr., 282 P.2d 783.

The next proposition of error advanced is: "The error of the trial court in admitting in evidence testimony as to the result of a chemical analysis of an unidentified blood specimen, showing the alcoholic content thereof."

This proposition was first presented by a motion to suppress such evidence, having for its object the exclusion from the consideration of the jury of the chemical analysis of the blood specimen made by H. E. Maxey, Chemist with the State Health Department, whose report showed that the specimen examined contained 0.16 per cent alcohol, measured by weight. This motion was based on the contention:

"(1) The evidence is wholly insufficient to identify the blood specimen examined by the State Chemist as the specimen of blood taken from the body of the defendant, Roy Crossett.

"(2) The evidence as to the time elapsing from the time this blood was taken from the cold storage and transmitted to the State Laboratory was sufficient to allow deterioration which would prevent an accurate laboratory test to ascertain the alcohol content of the blood specimen."

The motion to suppress was overruled, as a matter of law. The court apparently was of the opinion that the outcome of the blood test was only one of a number of factors bearing on the ultimate question of whether or not the defendant was intoxicated. Thereafter, the question of whether the blood specimen had been sufficiently identified was submitted to the jury under proper instructions, being Nos. 26 and 27, and the issue was seemingly decided in favor of the defendant. There was no objection made to the instructions given by the court and covering this matter.

While counsel concedes that inasmuch as his client was not convicted of manslaughter in the first degree (which the jury would have been compelled to do had they found that the defendant was operating his automobile while intoxicated), he says: "We desire to appeal to the practical experience of the members of this court and again point out that verdicts in cases of this kind are of necessity based upon the compromise of the views of the various members of a jury and that a man's liberty and his property should not

be subjected to the uncertainty of theory in weighing the effect of such improper or prejudicial evidence. If there was no sufficient identification of the blood specimen examined by the State Chemist, then no living man is able to say that the reception of this evidence by the trial court did not prejudice the rights of this appellant."

We are not going to detail the evidence with reference to the identification of the blood specimen in question, because the defendant was convicted of the included offense of culpable negligence in the operation of his automobile, rather than operation of the same while intoxicated. However, there is merit to counsel's contention that the blood specimen in question was not properly identified.

The technician taking the sample of blood put the same in two test tubes, corking them and did not label, but wrapped them in a slip requesting an analysis by the State laboratory and placed them in a labelled container in the northeast corner of the biological ice box. He never saw the two tubes thereafter. A nurse got one tube out of a different part of the refrigerator, there was no request slip with this tube. One highway patrolman said a slip of paper with defendant's name on it was stuck by scotch tape to the cork of the tube containing the specimen, and that it was delivered to him. There was no evidence as to who labelled the tube. The other patrolman said that the tube was in a card-board mailing tube, and was delivered to him by the nurse. The officers agreed that a tube was taken to a doctor in Hugo and they got the receptionist to make out a request slip and furnish a different mailing tube. Thereafter the one tube was sent to the State laboratory by Mistleto Express. The jury, it would seem from the verdict, already pointed out, decided that the specimen was not properly identified, though in addition to this expert evidence, there was evidence from a number of lay witnesses who were of the opinion that defendant was intoxicated. Moran v. State, 95 Okl.Cr. 6, 237 P.2d

920, 921. The fact that one quart of beer had been broken in the collision and had spilled on the front seat of defendant's car and upon him, might have influenced the testimony of these lay witnesses to a certain extent, and the fact, as testified by an expert witness, that the reactions of a person in shock, as defendant was shown to have been, and an intoxicated person are much the same, could be expected to have some influence. What effect this evidence might have played in the final sentence imposed, if any, is highly speculative, though we concede the validity of the argument interposed by counsel, which will have some bearing on our final conclusion.

The third assignment of error is based on the following recitation found in the record:

"During the closing argument to the jury by the special county attorney, Vester Songer, he stated: 'Far from being the mild-mannered man so eloquently pictured here by Mr. Welch, the evidence in this case show that on the night in question this man was just another bleary-eyed drunken sot.'"

The record is silent as to whether timely objections or exceptions were made to the remarks. Nor does the record show what remarks were made by defense counsel in his argument to the jury when he "so eloquently pictured" the defendant as being a mild-mannered man.

In Hunsaker v. State, 81 Okl.Cr. 321, 164 P.2d 404, paragraphs 4 and 5 of the syllabus, this court said:

"Ordinarily, error cannot be predicated upon mere unexplained excerpts of remarks of counsel to the jury. Enough must appear of record to advise this court of what preceded the alleged objectionable remark, and the meaning to be deduced from the context, and whether or not they were invited or provoked by the remarks made by the opposing counsel.

"Where the record is incomplete touching upon alleged disparaging remarks made in the closing argument, this court will presume that the trial court ruled correctly."

Also in Greer v. State, 75 Okl. Cr. 111, 128 P.2d 1018, 1019, paragraph 2 of the syllabus we said:

"County attorney has the right to draw his deductions and conclusions from the evidence, and unless his argument is such that it arouses the passion and prejudice of the jury to the extent that they would be swayed from arriving at a just verdict, the judgment will not be disturbed on appeal."

As to the contention that the punishment imposed is excessive, we have made conscientious effort to determine if the record would disclose facts that would justify modification due to errors in the record that might have proven prejudicial. The jury no doubt was aware of the history of the defendant as a good citizen and of his age of 68 years. But here was a case where a death ensued by reason of the collision in question. The daily deaths from motor car collisions in this State and in the Nation attest to the seriousness of the problem before the jury. We cannot say that the jury was wrong in reaching the conclusion that it did, because it was within the province of the jury's duties to determine the facts. We can only go this far in an effort to eliminate any prejudice that might have been engendered by reason of the frailty of the identification of the blood specimen: Reducing the jail sentence from six months imprisonment to four months imprisonment. Further relief would not be justified on account of the additional lay evidence the jury had for consideration.

The judgment appealed from is affirmed in all things, except as to the jail sentence, which is modified from six months to four months imprisonment in the county jail.

JONES, P. J., and BRETT, J., concur.