Robert Dawl BEAVERS, Plaintiff In Error,
v.
The STATE of Oklahoma, Defendant In Error.

No. A–12131.

Criminal Court of Appeals of Oklahoma.

March 2, 1955.

Rehearing Denied April 27, 1955.

See also 267 P.2d 154.

784

Appeal from the District Court of Pottawatomie County, Oklahoma; J. Knox Byrum, Judge.

Robert Dawl Beavers was convicted of the crime of manslaughter in the first degree, sentenced to serve 18 years in the State Penitentiary, and appeals. Affirmed.

David Tant, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

POWELL, Judge.

Robert Dawl Beavers was jointly charged with Edith Edgemon in the district court of Pottawatomie County with the crime of murder. Thereafter a motion to quash information and dismiss cause as to Edith Edgemon was by the court sustained, following which defendant Beavers was tried before a jury, convicted of manslaughter in the first degree, and his punishment fixed at 18 years confinement in the State Penitentiary.

■ Counsel perfecting appeal did not try the case in the lower court. In felony cases the appeal must be taken within six months after judgment is rendered. Tit. 22 O.S.A. § 1054. The purpose of this statute is to afford a convicted person ample time in which to have the record typed and prepared by the reporter, and this applies whether the record would be ten pages or thousands of pages. In the within case the casemade was completed by the court reporter on July 14, 1954, but was not certified by the clerk of the trial court until September 9, 1954, and was not filed in this court until October 6, 1954, the last day of the six months period.

Under Rule 6 of the Criminal Court of Appeals, 22 O.S.A. c. 18, Appendix, the plaintiff in error, referred to as defendant herein, had 60 days in which to file brief in support of his petition in error. No brief has been filed, nor was any written application filed prior to the expiration of said time for an extension. The case, being in default for a brief after December 5, 1954, was left off the January docket, but was placed on the February 16, 1955 docket for oral argument. No further continuance could be justified under such a state of the record. The cases heard on February 16 were submitted and assigned to the judges for opinions immediately, as opinions had been prepared in all previously assigned cases where briefs had been filed.

■ This detailing is for the purpose of stressing the importance of attorneys filing briefs within the time provided by the rules of this court, which afford ample time. In fact, by diligence a brief in the average case could be filed right about the time the record is filed without undue hardship, presuming that counsel would always have a trial brief. But at all events, counsel must, prior to the expiration of the time allowed for filing brief where additional time is desired, make written application setting up grounds that in the opinion of the court would justify further time. Otherwise there would be no point in adopting rules, as such might be ignored with impunity.[1]

Rule 9 of this court provides:

"When no counsel appears and no briefs are filed, the Court will examine the pleadings, the instructions of the court, and the exceptions taken thereto, and the judgment and sentence, and if no prejudicial error appears will affirm the judgment."

In the within case we have gone further than the requirements of the above rule, and have examined the motion for new trial filed in the lower court, and the petition in error filed in this court, and have carefully read the entire record of 469 pages.

The information in essence charged that Robert Dawl Beavers did, on January 8, 1954, murder Walter Haskell Phillips by firing and discharging a certain .32 automatic pistol loaded with powder and bullets, causing certain bullets fired from said gun to enter the body of Walter Haskell Phillips and thereby causing certain mortal wounds from which he died as intended by Robert Dawl Beavers, etc.

1. It is interesting to note that in England the defendant is given ten days after conviction to take his appeal (in contrast to six months in Oklahoma), and the appeal is usually heard within four or five weeks. The original proceedings in the trial court constitute the record sent up, and no briefs are prepared. The trial judge's notes and a report by him go up. Provision for shorthand reports of the testimony has been construed as merely directory, hence they are not always taken. The court almost invariably pronounces its opinion immediately after hearing. Provision for legal aid for poor defendants is made. Orfield, Criminal Appeals in America, pp. 29–30.

In many of the states appeal is by permission, and not as a matter of right. Oklahoma is one of the most liberal states in the Union in affording persons charged with crime every safeguard against injustice, both in the matter of trial and review of conviction. Acquiescence of this court in the abuse of our liberal constitutional and statutory provisions and the rules of this court can only be expected to finally bring about a re-examination of our laws and the loss or curtailment of present liberal rulings.

The defendant admitted the shooting. The defense interposed was justifiable homicide.

The State produced evidence to show that the defendant had been married to Edith Edgemon, but that they had been divorced; that on the afternoon of January 8, 1954, Edith Edgemon had driven around the streets of Shawnee in her 1953 convertible Buick car with Robert C. Johnson and his wife Yvonne Johnson; that Edith Edgemon was attempting to borrow money on a portable radio; that Yvonne saw "Bill" Phillips, the victim of the shooting, and mentioned it; that Johnson had not seen Phillips in 19 years since both of them served in the State Reformatory at Granite; that Edith turned and said: "He has a picture of mine that I would like to get", and she drove her car over to the curb and stopped and they talked to Phillips and Edith gave him her telephone number; they later went by Edith's place and Edith talked with Phillips by telephone, and Yvonne agreed that Phillips might come up to her apartment to pick up Edith, who had agreed to go drink beer with him; that Johnson and wife and Edith returned to the Johnson apartment and later, about 6:45 or 7:00 P. M. Phillips came there and they all had drinks and were sitting talking when about 8:30 someone knocked on the apartment door, and Johnson went to the door and let the defendant in, who immediately sat down and talked with Phillips. In their conversation the defendant accused Phillips of having pulled a knife on some boys in the past, and Phillips said, "Well, let's forget about it and have a drink". All were drinking. Edith got up and went in the bathroom and the defendant followed her. Johnson went to the back porch. Yvonne said that she saw Phillips pick up a small stool and go toward the bathroom, and soon she heard shooting. That the defendant came out of the bathroom and put a pistol on a table and said, "Well, it was my life or his, and he come in on me."

Johnson testified that before he went out on the porch and after Edith and defendant had gone in the bathroom that Phillips had said that he had an old score to settle with "Bud", referring to Beavers, and asked Johnson if he could settle it up there, that there would just be a lick or two, and Johnson said, "No. I don't want any trouble up here. I don't want the police up here." Phillips answered, "OK, then, let's forget it."

Johnson testified that there was a noticable interval between the first shot and the shots that followed. Johnson said that he told the defendant he would have to call the police, but defendant said, "don't call them right now." Witness said that he went ahead soon and called the police. He admitted that defendant had suggested something about wrapping the body in blankets and something was said about getting it out of there.

The evidence developed that when the officers got to the apartment and were let in they found Walter Haskell Phillips lying on his back in the bathroom of the Johnson apartment, with a bullet hole in his left eye with exit through the back of his head; that his left hand was up close to his head and an open knife lay loosely in his palm with blade pointing toward his shoulder.

Dr. Paul C. Gallaher performed an autopsy on the body. He found a number of bullet wounds on the body, but testified that the bullet wound through the head should have caused breathing to stop immediately, and the heart to not beat over three to five minutes after that wound. He testified that in addition to the bullet wounds that there was a sharp deep cut with a bruise over the left eyebrow; that the bruise extended down on to the nose. Witness was asked if he had an opinion as to whether the bruise was made while the victim was still alive. Said he: "If the cut over the eye had occurred after he had died, then there would not be extension of the bruise out under the tissue; because you must have a maintenance of blood pressure in order to get the extensive bruising around the edge of the wound that we observed in this patient."

Witness testified that the bullet entering the eye could have been expected to cause the deceased "to drop like, let us say, a sack of oats. * * * I would expect him to go limp." Witness testified that the deceased

had many old scars on his arms, hips and legs. And stated further, that in addition to the bullet wound in the head he found six bullet wounds in the chest and upper abdomen from the right side, and coursed over to the left side of the body.

There was other medical testimony corroborative of Dr. Paul C. Gallaher.

W. P. Phillips, father of the deceased, a butcher by trade, testified that the deceased, was his son, that his son worked with him; that on January 8, 1954, his son helped dress chickens but could not draw the chickens because he could not grip with his left hand by reason of an injury the year previous in a car wreck. He further claimed that his son did not own a pocket knife, but only a little pen knife carried on a chain that was found on him at his death. Witness denied ever having seen the knife found after death in the palm of his son's left hand. He said that when his son would go to sharpen or "steel" a knife that he would have to lay his hand flat on the knife on the table and sharpen it that way; that he had no grip in his left hand.

Yvonne Johnson testified that when she saw Phillips follow the defendant and Edith to the bathroom that she saw a small stool in his right hand but did not see any knife. After the shooting, when her husband went to call the police, she said the defendant said something about getting their stories straight.

Ernest Coleman, Captain of the Shawnee Police Department, testified to going to the Johnson apartment, finding the body of Phillips on the bathroom floor, about the knife in the palm of his left hand, about finding eight empty .32 calibre shells and a .32 calibre automatic pistol on a table and about defendant admitting ownership of the pistol and having shot the deceased; that the defendant stated that he saw his former wife's car in front of the Johnson apartment and went up there to see her; that defendant claimed that deceased came into the bathroom with an upraised stool in his right hand and a knife in the left, and that the first shot he fired killed Phillips but that defendant was so mad that he "emptied the rest of the gun in his body."

The defense introduced evidence to show that the deceased during his lifetime had been convicted of second degree robbery, larceny of an automobile in Oklahoma County, larceny of an automobile in Grady County, had served in the Granite Reformatory and the Penitentiary at McAlester; and had been in brawls.

Nellie Parks of McAlester testified that the defendant prior to divorce from Edith Edgemon had rented a cabin from her; that defendant and his wife had a quarrel and the defendant left for the week-end, and Edith then used the telephone of witness to telephone Walter Haskell Phillips at Shawnee to come and get her, but in the meantime her husband, the defendant, returned, so she made up with her husband and got him away from the house, so that he would not be there when Phillips would arrive; that Phillips did arrive and said: "I come after that lady and I'm going to take that lady back, but I'm going to take that man right up on the hill." That Phillips was drinking and came back several times but finally left; that she told Beavers and his wife about this when they returned.

Edith Edgemon admitted that she was "pretty tight" the night of the tragedy. She said everything happened quickly; that there had been no argument there that night. She claimed that Bill, the deceased, was jealous of Bud, the defendant; that she got up to go to the bathroom; that the defendant went into the kitchen and was talking to Mrs. Johnson and said that if Bill was with Edith that he would leave, but Mrs. Johnson told him that she, Edith, was not with Bill, and that she had been wanting to see the defendant to make up with him, and witness testified that she called defendant into the bathroom and that he had his arms about her, loving her and that she and her ex-husband were making up when the deceased "busted" in with the stool in his hand. She said that she did not see a knife; that defendant whirled her around, reached in his pocket, got his pistol out and shot over her shoulder, and deceased fell. She said she left the room as soon as the first shot was fired.

Witness on cross-examination admitted that after her arrest with the defendant that

she made the statement in the sheriff's office that defendant caught her and the deceased in bed together once, and if defendant had been a cold-blooded killer he would have shot Phillips then. She also admitted to having gone under various assumed names, and to convictions in Oklahoma and other states for prostitution.

Robert Dawl Beavers, the defendant, testified to having known the deceased for many years, to having seen him draw a knife on people two times, to having a fist fight with him once to quiet him down, knew of deceased serving in the penitentiary, etc., and of threats made against him when deceased came to McAlester once looking for defendant's wife. He further testified to other brawls in which deceased had been involved.

Defendant claimed that on the night of the tragedy he was on his way to a dance and had his pistol with him for the purpose of pawning it for about five dollars for expense money, and as he passed the Johnson apartment he saw his former wife's car there, and decided to go up and see her, as he still loved her. Said he: "And I know the Johnsons. I've visited them every day for the last three or four years; go up and have a few drinks with them. Maybe play cards." He denied seeing Phillips' car parked there, and claimed that he would not have gone up to the Johnson apartment if he had known Phillips was there. His story of what happened was the same as that of Mr. and Mrs. Johnson, and his former wife Edith.

On cross-examination defendant admitted that in the divorce a few months earlier his wife had caused a restraining order to be served on him, requiring him to stay away from her, but the evidence developed that defendant could neither read nor write, although he grew up in a city abounding in educational institutions.

On cross-examination for the purpose of bearing on the credibility of the testimony of the defendant, the court permitted the prosecution to question him as to past convictions. He admitted that in case No. 895 in 1940 in the city court of Shawnee he was convicted of carrying concealed weapons, but stated that the gun was under the seat of his car; that in 1952 he was convicted in the city court of Shawnee for disturbing the peace and fighting; that he was convicted May 23, 1944 in the same court for disturbing the peace and fighting; that in the city court of Texas City, Texas he was convicted of intoxication and affray but said that it was "just me and my wife having a little trouble on the highway". He admitted that in case No. 52,472 in the city court of Oklahoma City he was convicted of consorting with a prostitute and paid an $18 fine; and on February 10, 1953 he plead guilty in the county court of Pottawatomie County and paid a fine.

Defendant insisted that he shot Phillips in self-defense, that deceased had a knife and that he was in fear of deceased.

The State on rebuttal produced Dr. Phil Haddock of Norman, who operates a clinic there. He testified that Walter Haskell (or Bill) Phillips, the deceased, whose pictures he recognized had been a patient of his. He said he had treated deceased for injuries received in an automobile accident; that the main injury was to his left arm, that "The bone was broken at an angle and bent out of line to a considerable angle, and, of course, the muscles and ligaments and so forth have to be torn when the bone is broken and pulled out of line." Witness stated that the last time he treated deceased was July 27, 1953 but that he had seen him since then; that he had placed three screws to hold the bone in place and placed his arm in a cast. Witness said: "My opinion is that he could use his hand, but not as well as normal; that he couldn't grip as well. It was weaker than normal. His whole arm was weaker than normal."

Mrs. Ruth Phillips of Norman, surviving wife of the deceased, testified concerning the injuries to her husband received in an automobile accident about one year prior to his death. She testified that since the injury she had observed that her husband could not grip anything with his left hand.

Charles Marvin Pierce, Norman, testified that he operated a locker plant at Norman

and that the deceased had worked for him as a butcher, and he said the deceased did not have much use of his left arm, and demonstrated to the jury how deceased would use it when he was cutting meat.

Louis Sparks, insurance agent of Norman, swore that he had lived next door to the deceased at Norman, and helped him unload a refrigerator at the home of deceased, and that Phillips was unable to use his left hand in the unloading.

There was other rebuttal evidence, and there were other witnesses who testified for the State, and witnesses who testified for the defendant, but it is not necessary to summarize all the evidence. Our task has been to determine whether or not there was competent evidence in the record to support the verdict of the jury.

In the matter of a review of the evidence, we have often pointed out that the function of the Criminal Court of Appeals is limited to ascertaining whether or not there was a basis, in evidence, on which the jury could reasonably conclude that the accused was guilty of the charge. This court does not weigh the evidence. Lyons v. State, 94 Okl.Cr. 288, 234 P.2d 940; Martin v. State, 94 Okl.Cr. 340, 235 P.2d 959; Campbell v. State, 95 Okl.Cr. 396, 247 P.2d 281; Williams v. State, Okl.Cr., 263 P.2d 527; Lazar v. State, Okl.Cr., 275 P.2d 1003; Field v. State, 95 Okl.Cr. 161, 241 P.2d 1122.

Stated in another way, we have said: "Where there is competent evidence in the record from which the jury could reasonably conclude that defendant was guilty as charged, this court will not interfere with verdict even if there is a sharp conflict in the evidence and different inferences may be drawn therefrom since it is the exclusive province of the jury to weigh the evidence and determine the facts." Sholes v. State, Okl.Cr., 260 P.2d 440, 442; Lowrey v. State, 87 Okl.Cr. 313, 197 P.2d 637.

We have carefully read the instructions and find that defendant's theory of defense was clearly recited and the court gave proper instructions covering every matter properly before the jury for consideration, and no objection was interposed to any instruction given, nor were additional instructions requested, with one exception. The evidence had shown that defendant had been convicted of carrying a concealed weapon. This evidence was admitted by the court for consideration of the jury as to weight and credibility of accused's testimony. Under such circumstances, the court said: "I don't think it is necessary for the court to advise the jury about the man's right or lack of right to carry a loaded pistol about the city."

Complaint was made of certain other arguments of the county attorney in addressing the jury, and where the court ruled that the argument was a legitimate comment on the evidence. The argument was not reported and the record presented supports the rulings of the trial court.

From the opening statement of the county attorney it appears that it was the theory of the prosecution that someone placed the knife in the left hand of the deceased after he was killed in that he was right-handed, and that by reason of an injury to his left arm he could not grip a knife in his left hand. There was evidence to support such a theory. Defense counsel objected to the deductions of the county attorney in his argument to the jury concerning this matter, though the argument is not reported. So the court gave this further instruction:

"Gentlemen of the Jury and lady, the county attorney has just made the statement regarding a knife placed in the hands of the deceased. Counsel for the defense has objected on the ground that there is no evidence of it. The Court tells the jury that the court has heretofore instructed the jury that they may draw upon their experience in human affairs, and that counsel on either side are entitled to state to the jury any deductions which they may have from the evidence which are reasonable and fair deductions. Otherwise, counsel are to stay within the evidence and the reasonable and fair deductions thereof. And any statements made outside of such evidence or outside of any reasonable and fair deductions from the evi-

dence, the jury are to entirely disregard as heretofore instructed by the court in its written instructions."

In Kennamer v. State, 59 Okl.Cr. 146, 57 P.2d 646, 648, and in paragraph 12 of the syllabus, we said:

"The right of argument contemplates a liberal freedom of speech, and the range of discussion, illustration, and argumentation is wide. Counsel for both the state and the defendant have a right to discuss fully from their standpoint the evidence and the inferences and deductions arising from it. It is only when argument by counsel for the state is grossly improper and unwarranted upon some point which may have affected defendant's rights that a reversal can be based on improper argument."

The record discloses that this case was well tried by both the prosecution and the defense counsel. The deceased had a record for crime, and the defendant had a record of conviction for misdemeanors. Two of the three witnesses at the scene of the homicide had criminal records. It is apparent that the feeling between the deceased and the defendant came about by reason of the former wife of defendant, Edith. She said that the deceased was jealous of her former husband. The evidence disclosed that Edith Edgemon had been a willing recipient of the attentions of the deceased in the past, as well as of various other men, in that she admitted to practicing prostitution in various localities.

It is not, as indicated from the authorities cited, within the province of this court to attempt to determine whether or not the deceased actually attacked the defendant with a knife. That was the problem for the jury. It was not an easy problem. The evidence was conflicting. The jurors evidently used their best judgment. We can find nothing in the record that would justify or authorize this court in any way interfering with the verdict and judgment rendered.

There is another reason which, if urged, would require either a dismissal of the appeal or affirmance of the judgment, and being that there is no filing mark in the casemade, or imprint of the clerk's stamp to indicate that the same was filed with the papers in the case as provided by § 958 of Tit. 12, O.S.1951. In this connection see also § 1059, Tit. 22 O.S.1951, and annotations under such sections.

We must therefore affirm, and do affirm, the judgment and sentence of the district court of Pottawatomie County.

JONES, P. J., and BRETT, J., concur.