## CAMPBELL v. STATE.

No. A-11565. July 23, 1952.

Rehearing Denied Sept. 24, 1952.

Further Rehearing Denied Oct. 22, 1952.

(247 P. 2d 281.)

Jenner & Bradley, Hugo, Lee Welch, Antlers, and Hal Welch, Hugo, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

POWELL, J. The plaintiff in error, hereinafter referred to as defendant, was convicted before a jury in the district court of Pushmataha county of the crime of larceny of live stock, and sentenced to serve a term of three years in the State Penitentiary. Appeal has been duly perfected to this court.

For reversal, defendant advances and argues four specifications of error, as follows:

"1st. The evidence was wholly insufficient to support a conviction of the crime of larceny of domestic animals.

"2nd. The error of the trial court in refusing to permit the defendant, on cross-examination of the owner of the stolen cow, to bring out and establish that the cow had never been taken out of Choctaw County.

"3rd. The error of the trial court in failing to instruct on the law of circumstantial evidence.

"4th. The misconduct of the prosecuting officers in putting before the trial jury statements, questions and inferences to the general effect that there was no record at the Sulphur Springs, Texas, Sales Barn that the defendant had ever bought a cow that fit the description of the animal involved in this prosecution."

The contentions advanced require presently a review of the testimony given at trial.

The Attorney General in his brief calls our attention to the principle of law set out in Tucker v. State, 89 Okla. Cr. 30, 204 P. 2d 540 (which has been adhered to in many cases both prior and subsequent to that case), to the effect that:

"Criminal Court of Appeals will not reverse a case for insufficiency of evidence unless it can say that there was no substantial evidence in record upon which verdict could be based."
Also:

"In considering the sufficiency of the evidence, the function of this court is limited to ascertaining whether there is a basis in the evidence on which the jury could reasonably conclude that the accused is guilty as charged."

Counsel for defendant urge the principle set out in Riley v. State, 40 Okla. Cr. 135, 267 P. 494, and other cases, where it is said:

"Where a case depends upon circumstantial evidence, it is the duty of the court to advise the jury that it should acquit the defendant unless the circumstances proven are of such a character as to exclude every other reasonable hypothesis save that of defendant's guilt."

Defendant contends, among other things, that he was convicted solely on circumstantial evidence, and that the evidence was wholly insufficient to support his conviction. But the state denies this assertion. We have carefully read the record to determine whether or not the state relied solely on circumstantial evidence, and whether or not there is substantial evidence in the record upon which the verdict could be based.

Tom Wilkins for the state testified that he lived at Oleta, which is near the Choctaw-Pushmataha county line, and farmed and had a few cattle. He stated that on October 23, 1948, he attended a sale of cattle at the sales barn at Antlers, and produced a sales invoice showing that he purchased two head, tagged 182 and 240; also produced two tags numbered 182 and 240, respectively, testified to the 240 tag having by him been clipped from the left ear of a red white-face muley cow (that is, a cow without horns), weighing 755 pounds, and testified that tag No. 182 was clipped from the ear of a white-face cow with horns, weighing 780 pounds. He further stated that a neighbor, Merlin Hinson, hauled the two head of cattle to the home of witness and assisted in clipping the tags from their ears and in branding them on the left hip with the brand of witness, and being W O — [bar]. The cattle were then turned on a 160-acre Bermuda pasture adjoining the home of witness where they were kept for about 30 days along with other cattle already there. Thereafter witness moved his cattle south and east to the Sissie Jefferson place.

Witness further testified that when he was bidding at the cattle sale at Antlers one Shiney Earthman was sitting behind him and the defendant Arlis Campbell came in and sat behind him, and when he bid on the muley cow, tagged 240, Arlis was telling him to stay in the bidding, that this was his cow and was a good young cow, five years old. Said he: "Jake Weaver and I was bidding. He was across the ring in front of me. Jake bid and I quit. Arlis Campbell punched me and said 'Get it.' I raised him a dime and bought the cow." Witness stated that the muley cow was a light springer and had a Brahma calf June 2, 1949, over seven months following purchase.

Witness Wilkins further stated that about six weeks after he purchased the cow in question he received word from Bernice Floyd (shown to live at Spencerville and four and three-quarters miles from the Sissie Jefferson pasture) that his red white-face muley cow that had been missing for a long time had shown up at his place with Wilkins' brand on it. Witness went to the Floyd home and talked to Mrs. Floyd.

"I told her where I got the cow, told her I bought it at the sale, that Arlis Campbell sold it to me, he claimed it was his cow, he told me he did own the cow when I bought her and she was a good young cow. I didn't have the papers but I told Mrs. Floyd I could show her the papers next morning. Arlis was gone to Oklahoma City, and the next morning he had gone to Hugo. And he come down there and looked and said it was not the cow he sold. I gave him the papers and he said that didn't amount to anything. He said that was a bigger cow. He said the cow he sold was a bigger cow and a heavy springer, and he didn't sell that cow. Q. What did you do with reference to the tags? A. I had my papers and I came back to Antlers and took them to Lawrence Wade [the deputy sheriff] to go to the barn and check on it."

Witness stated that after talking with Mrs. Floyd he went to see the defendant, who refused to do anything about the matter, and claimed that he sold a larger cow that was a heavy springer, and later at Floyd's in the presence of defendant and Bernice Floyd, who was defendant's brother-in-law, witness loaded up the muley cow and took her home and told Campbell and Floyd they could settle the matter between them.

Witness stated that he had talked to the sheriff and county attorney about the matter and they stated they would find out if that was the cow sold to witness at the sale. That witness did not file a complaint, but the county attorney did. Mr. Wilkins further testified that to his knowledge Bernice Floyd had a Brahma bull with his cattle, and the muley cow in question gave birth to a Brahma calf around seven months after purchase.

Bernice Floyd testified that he lived at Spencerville, Choctaw county; that in October or November, 1948, his white-face muley cow, that he had raised from a calf and named Betty, and weighing about 800 pounds, came home with Tom Wilkins' brand on it. That he had never sold the cow or authorized anyone else to sell her; and that she was a gentle cow.

Merlin Hinson testified that he lived just across a field from Tom Wilkins at Oleta and that on October 25, 1948, he attended a cattle sale at the sales ring at Antlers. Mr. Wilkins attended the sale, and Wilkins bid on a red white-face muley cow. Witness was within twenty feet of Mr. Wilkins when the bidding was going on. The defendant Arlis Campbell sat right behind Mr. Wilkins and Campbell said to Wilkins about the cow in question: "Don't lose her, Mr. Wilkins, that is my cow. She is not over five years old." Witness further testified that he hauled this cow, together with a red white-face cow with horns that Wilkins purchased, to Wilkins' home the same day of the sale, and the next morning he helped Mr. Wilkins clip the tags from the ears of these cows and helped him brand them with W O — [bar] brand. He stated that later he went with Wilkins to Bernice Floyd's when Wilkins went after this cow. He further stated that this was the same cow that he hauled from the Antlers sale barn to Wilkins' home. He stated that when he went with Wilkins to see about the cow, the defendant Campbell said: "He says to me, he wanted to know how the hell I could testify that was the same cow when he had her two or three weeks and he couldn't." Witness stated that when he first hauled the cow from the sales barn for Wilkins she was a light springer and was gentle except she was scared of a rope he discovered when he saw another party rope her at Mr. Floyd's lot.

Don Wasson being deceased at time of trial, his evidence given at the preliminary was read. He had testified that he was office manager of the Antlers Livestock Commission Co., and kept all the records. That his records for October 25, 1948, showed that Arlis Campbell had eight head of cattle sold at their barn, one animal being numbered 240, weighing 755 pounds, and from the seller's invoice was a white-face cow; that she was sold to Tom Wilkins who also bought a cow with tag 182 brought in by C. Duncan and weighing 780 pounds.

A number of other witnesses testified for the state as to Floyd losing a red white-face muley cow, and to the cow with the Wilkins brand on it being the identical cow, and testifying to finding a hole in the upper left ear of this muley cow, indicating that she had been theretofore tagged.

Lawrence Wade, former deputy sheriff, testified that in 1948 he investigated the ownership of a cow in dispute between Tom Wilkins and Bernice Floyd. That Arlis Campbell claimed that the cows he sold through the Antlers sales barn were purchased by him at a sale at Sulphur Springs, Texas, and witness accompanied Coy Rosenthal and Marx Childers, county attorney, there to investigate the red white-face muley cow. His further answers were stricken from the consideration of the jury on objection that the Texas records would be the best evidence of the description of cows purchased by defendant at Sulphur Springs.

The court overruled a demurrer interposed by defendant to the evidence of the state. We conclude that this action was justified, by reason of the summary above set out, because, if this evidence was true, then the defendant sold a red white-face muley cow, being a light springer, weighing 755 pounds, at the Antlers sales barn on October 25, 1948, which was purchased by Tom Wilkins and that later proved to belong to Bernice Floyd, who did not sell the animal or authorize anyone else to sell her. Having been in the possession of defendant, it was incumbent on defendant to explain such possession or show that the cow he actually sold Wilkins was in fact another cow.

In opposition to the evidence of the state, T. F. Wall testified in behalf of defendant. He stated that he had lived at Spencerville since 1908. That both the defendant and Bernice Floyd were his sons-in-law, and both ran general stores at Spencerville and both handled a few cattle each year. Witness recalled the time that Arlis Campbell took some of his cattle to the sales barn at Antlers and he stated that he saw the cattle loaded and claimed that he had known the red white-face muley named Betty that Bernice Floyd raised, and stated he was positive that Campbell did not load her in the truck. That he did load a muley but she was heavier than Floyd's Betty. He stated that later he examined the cow that came to Floyd's with Tom Wilkins' brand on her left hip, and that it was Betty, Floyd's missing cow, but was not the cow he saw Campbell load around two months before. Witness claimed that the muley that Campbell actually loaded was wild, while Floyd's muley was gentle and that Betty had more white from knee to shoulders. He stated that he was at the sale and that Tom Wilkins purchased the wild red white-face muley, and not the muley that finally showed up at Floyd's. He claimed that the cow Wilkins bought weighed, in his judgment, 800 pounds or more.

On cross-examination this witness did not know who purchased the other seven cows that Campbell had auctioned off at the same time the muley was sold.

J. L. "Shiney" Earthman stated that he lived at Spencerville and had known Campbell, Floyd and Wilkins for many years. That on October 20, 1948, he looked at some cattle Campbell owned and on October 24, 1948, he purchased fifteen head. On October 25 he helped Campbell load some cattle he was taking to the sale at Antlers and remembered loading a white-face cow, a big muley, a little wild and a heavy springer. He stated that this cow was difficult to load, that he, Mr. Wall and Arlis Campbell rode on the truck to Antlers; that later he saw the cow that came up to Floyd's place with the Wilkins brand on her, and that she was not the cow Campbell took to the sale. He estimated the brand could not have been more than fifteen days old. He stated that when he first looked over Campbell's cows that Campbell showed him the papers on the muley cow and she weighed 805 pounds and he offered Campbell $120 for her, but he would not take it, and decided to take her to the sale.

Almus Chapple testified that he lived at Spencerville, that in October, 1948, he looked over Arlis Campbell's cattle and was attracted by a large red white-face muley cow, bumping heavy with calf that he estimated would be born in 60 or 70 days, and that he figured weighed 850 or 875 pounds; that Campbell stated that he purchased her at Sulphur Springs, Texas, and he wanted $140 for her, and witness thought this a little high and did not purchase. He stated that later he saw the muley cow that was in dispute between Tom Wilkins and Bernice Floyd, and he was sure that this was not the same cow he had seen in defendant's pasture in October, 1948.

Ray Earthman, son of Shiney Earthman, recalled the loading of the Campbell cattle for the Antlers sale and he thought the muley that Campbell loaded

weighed 850 or 900 pounds and stated that she was a heavy springer and was a different cow from the Floyd cow named Betty.

There were other witnesses testifying to their knowledge of defendant purchasing cattle at Sulphur Springs, Texas, but which evidence did not add anything of importance different from the other witnesses.

Arlis Campbell testified that some time the last of October, 1948, or the first part of November, he did not remember which, he took some cattle to the sales barn in Antlers; that part of the cattle came from Texas; that he took eight head; that the Texas cattle had been purchased at the sales barn in Sulphur Springs, either one or two weeks previous to the Antlers sale; that he had two or three white face cows in the bunch he sold. Witness was asked:

"Q. Do you know the cow Mr. Wilkins bought? A. Yes, I had the slip. The slip is made out and a tag in one ear, and you get the duplicate of it. We were both on the east side of the sale barn and I was close where I could see them coming through the chute. I was watching them come through so I would know when my cows came through. I had not paid too much attention to them, when you are trading and buying them it is hard to know cows. I was watching the numbers and that was how I would know when my cows came in. I would look at the tag, where they tear off a part and if the cow corresponded with the one I had it was my cow, and I looked to see if it was my cow."

Witness further stated that he loaded the cow Mr. Wilkins bought, south of his store in the lot of his pasture. He stated that Almus Chappel and Shiney Earthman had both tried to purchase the cow that was subsequently sold to Tom Wilkins through the sale, and that these deals had attracted his attention to this cow. Said he:

"Yes, sir, there was quite a bit [that attracted his attention to this cow]. I had been trying to sell this bunch to Mr. Earthman. I saw him on Saturday and he came and looked at the cows on Sunday, and on Monday I got ready— he came over and was still trying to buy some cattle from me. We had the cows in a double lot, a little patch of half an acre that come on up to a small lot where I put the chute through the gate, but we had them in this big lot. This one particular white face cow, Shiney was trying to buy her, and offered me $120. I said, 'I can't take it, this cow cost more than that.' He said he didn't think so. I took him to the house and showed him the papers where I bought her for $121.50. I think it was $15.10. I think she brought the same price here as at Sulphur Springs. I showed where she cost me $121.50. He said, 'she won't bring it', and I said 'she will.' He said 'I am going to Antlers with you.' "

With reference to the cow in controversy between Wilkins and Floyd, and that Wilkins claimed was purchased from defendant, defendant was asked and answered on cross-examination as follows:

"Q. With reference to the one that was loaded, is that the same cow that was hard to load and was wild? A. She resembled that one, in lots of ways she resembled the one I loaded. Q. Could it be the identical cow? **A. She doesn't look like the same cow that was down there at that time, no, I don't think so. There is quite a difference in this cow and the cow I brought from Sulphur Springs.** Q. What is the principal difference between the one on the truck this morning and the one you got at Sulphur Springs? A. The cow I bought at Sulphur Springs was more of a full blood, didn't have as much Jersey on it. This cow is shorter, and a bigger framed cow and more of a full blood cow, little more reddish and a little different head. If you just look close I just won't say she resembles the cow."

Witness further stated that the cow that he sold Wilkins sold by the pound and brought $114.30, weighing something over 700 pounds; that when Wilkins

was bidding he turned and looked and told him that the cow belonged to him and was a good springer and a young cow. Witness testified:

"Q. Did you save the check-in slip that you got? A. No, sir. The reason I didn't have the check-in slip from Sulphur Springs, before this come up we've got a desk at home and I keep papers in. When I heard about this stuff, my wife had burned a whole lot of papers a day or two before it came up and I didn't have it to show where I bought them at Sulphur Springs, nor up here."

In rebuttal, Lawrence Wade, former deputy sheriff, swore that when defense witness Shiney Earthman came to the county attorney's office to talk about a bond for the defendant, after his arrest, witness heard Earthman make a statement with reference to the cow out at Mr. Floyd's and the one witness went out to see, and the cow Arlis Campbell brought to the sales barn. Said he:

"He said it was the same cow, and he went on to tell about how hard she was to load, and when Mr. Wilkins came after the cow he went to see her loaded, and he said it was the same cow. * * He said he tried to buy the cow, he said there was fifteen head of cattle in the pasture, and he offered him $120 for the cow." Witness further denied that Shiney Earthman said anything about the cow being a heavy springer. On cross-examination he stated: "He [Earthman] said it was the same cow, he didn't say it looked like the same cow, he said it was the same cow, and he said she was the hardest cow I ever saw to load."

Fred Wilkins on rebuttal testified that he went to Bernice Floyd's to help Tom Wilkins load the cow in controversy. That he roped her and she gave him some trouble, but not much. He stated that Shiney Earthman was present. Said he:

"When I got my rope and got out to catch the cow he said, 'Fred, you ought to watch that old cow, she mean, we helped Arlis load her that morning, and it taken us about hour to load her.' " Witness further stated that Ray Earthman rode up, that: "Shiney asked Ray, 'Do you know this cow?' and Ray says, 'I will say that is the cow we helped Arlis load. She is sure hard to load.' "

Witness further stated that a cow branded in the summer will peel quicker than in the late fall or early summer; that some brands take two months to peel, some may take longer, depending on how deep the cow is burned.

Merlin Hinson testified that he accompanied Tom Wilkins and Fred Wilkins to Bernice Floyd's to get a cow with W O — (W O bar) brand on it, and that he heard Shiney Earthman say:

"I offered to buy that cow, I offered $120, and he [Campbell] loaded her up and hauled her off and sold her for $114 at the sales ring."

Tom Wilkins in rebuttal stated that when he went to Bernice Floyd's to get the cow he had purchased at the sales ring, both Shiney Earthman and Ray Earthman identified her as being the same cow they helped Arlis Campbell load up to take to the Antlers sales ring.

We conclude from the evidence that we have summarized and pointed out that it was sufficient for the submission of the case to the jury. We cannot say, after a study of all the evidence, that there was no substantial evidence in the record upon which the verdict could be based, and on the other hand, from such study we are compelled to say that there is a basis in the evidence on which the jury could reasonably conclude that the accused was guilty as charged. Thus the evidence meets the test prescribed by Tucker v. State, supra, and a long line of cases by this court.

Defense counsel on appeal have written an excellent brief in which is analyzed the evidence relied upon by the state, and wherein is pointed out undisputed facts inconsistent with the guilt of the defendant.

While the argument presented is an excellent one and possessing much merit, still the points presented were matters for the jury to consider. The county attorney investigated the case to commence with, and no doubt pondered over all the matters set out. And the jury consisting of citizens living in the area and familiar with conditions there existing had the advantage of observing all witnesses as they testified, observing their mannerisms, their appearance of sincerity or lack of sincerity, and to consider their probable interest in the case, relationship with the parties involved, etc. And while it could be that the prosecuting officials and the jury erred in concluding from the evidence adduced that the defendant was guilty as charged, and that the jury could have as well believed the evidence of the defendant and his witnesses, it was in the province and the duty of the jury to decide the issue, and we are not at liberty to disturb the findings where the evidence meets the test heretofore set out and here applied.

Counsel contends by assignment of error two that the trial court erred in refusing to permit the defendant, on cross-examination of Bernice Floyd, the owner of the stolen cow, to bring out and establish that the cow had never been taken out of Choctaw county.

Bernice Floyd was shown to have lived at Spencerville in Choctaw county, and the animal transported by the defendant to the sales barn at Antlers was of course taken to Pushmataha county. And the defendant admitted that the animal actually sold by him at Antlers was puchased by Tom Wilkins.

The State produced Bernice Floyd and by his evidence and admissions by counsel it was brought out that a red white-face muley cow, shown by Tom Wilkins to have been purchased from defendant at the sales barn at Antlers and on the next day branded with the Wilkins brand, some six weeks thereafter showed up at Floyd's place and Floyd testified that this was his cow Betty; that he had never sold her or authorized anyone else to sell her. Counsel for defendant then proceeded to examine the witness as follows:

"By Mr. Jenner: * * * Q. Mr. Floyd, this cow you refer to, had you raised her at home? The cow you described, had you raised her at home? A. Yes, sir, raised her. Q. Was she a gentle cow? A. Yes, sir. Q. Had you been milking her shortly before you took her to the pasture? A. Yes, sir. Q. Do you recall, did you send your cattle to your pasture? Did you move some of them up to your pasture?

"By Mr. Lawson: Your honor, at this time I object to the line of questions as being direct examination. I did not bring those matters out. If he wants to do so later with this witness he may do so. By the Court: The objection is sustained. By Mr. Jenner: Exception.

"By Mr. Bradley: Comes now the defendant and states that this witness if he were permitted to testify would testify that to his knowledge this cow had never been out of Choctaw County, Oklahoma. By the Court: The offer is denied for the reason that the last mentioned objection was sustained, and that this matter is on cross-examination, and the denial is on that point only, and exception is allowed."

The cross-examination attempted by defense counsel was as to matters not inquired about by the prosecution on direct examination.

The implication raised by the question, however, was most important to the defendant, for if Bernice Floyd could have testified that he knew as a fact that

his cow Betty was at his place following the October 25, 1948, sale at Antlers, and that she did not disappear until some time later, that would have constituted a perfect defense for the defendant, and defendant by all means should have called Floyd as a witness in his own behalf, and we cannot conceive of his failing to call this witness, or of making him his witness if he could have established such fact by the witness. That was a vital defense that ordinarily counsel would seek to establish positively and affirmatively and at the first opportunity in prosecuting his defense. In fact, a sworn statement to the county attorney to such effect might have prevented the case being filed, if other facts would have tended to support it.

This court has often held that when the cross-examination is directed to matters not inquired about in the principal examination, its course and extent are very largely subject to the control of the court in the exercise of a sound direcretion; and, unless it affirmatively appears that this discretion was abused, the rulings of the court will not be reviewed on appeal. Hopkins v. State, 9 Okla. Cr. 104, 130 P. 1101; Ralston v. State, 54 Okla. Cr. 408, 22 P. 2d 1038; Murphy v. State, 72 Okla. Cr. 1, 112 P. 2d 438. We do not find that the court abused his discretion in the matter of the ruling made.

It is next contended that the trial court erred in failing to instruct on the law of circumstantial evidence.

While the defendant did not request the court to give an instruction covering the law of circumstantial evidence, nevertheless, it is contended that all the evidence against defendant was circumstantial. With this we cannot agree. The evidence of Tom Wilkins and Merlin Hinson was direct where they testified that the defendant urged Wilkins to bid on the red white-face muley cow sold at the Antlers stock sale on October 25, 1948, stating that the cow, which was numbered 240, was his, and was five years old; and further testified that this cow was branded by them with the Wilkins brand, and some six weeks later got out of the pasture and showed up at Bernice Floyd's at Spencerville and was shown by Floyd to have been a muley raised by him, and admitted by defendant to be Floyd's cow but on the theory that she was not the same muley that he had sold through the Antlers sale.

In the case of Scroggins v. State, 54 Okla. Cr. 54, 14 P. 2d 237, 238, where the defendant was convicted of the larceny of hogs, in the body of the opinion, Judge Edwards for the court said:

" * * * The further contention is made that the court erred in refusing a request for an instruction on the law of circumstantial evidence. The proof of possession by defendant and his connection with the prosecution in this case is a proof of asportation by direct testimony, and the case does not rest on circumstantial evidence alone, and it is only where the case is entirely circumstantial that the court should give an instruction on circumstantial evidence. The case is affirmed."

See, also, Lincoln v. State, 86 Okla. Cr. 415, 193 P. 2d 618, and Long v. State, 77 Okla. Cr. 174, 140 P. 2d 600.

Counsel finally urges that this case should be reversed because of certain alleged misconduct of the special prosecutor in attempting to bring out incompetent and inadmissible testimony.

The defendant testified that the cow sold to Mr. Wilkins at the Antlers sale was an animal that he had purchased through the auction at Sulphur Springs, Texas, about one or two weeks prior to the Antlers sale, and testified that his wife had cleaned out his desk and burned the papers he received as

evidence of the title at time of purchase. He had also made this claim to Tom Wilkins and the officers.

Deputy Sheriff Lawrence Wade, called as a witness for the state in its case in chief, was interrogated on direct examination by special prosecutor Marx Childers, as follows:

"Q. Who accompanied you to Sulphur Springs? A. Coy Rosenthal and the county attorney Marx Childers. Q. Do you remember about the size, and marking and brand on that cow? A. Yes, sir. Q. I will ask you whether or not from your investigation at Sulphur Springs or the records of sales, it showed that Arlis Campbell had purchased a cow at that sale that fit the same description. A. He had not. By Mr. Jenner: To which we object. The records at Sulphur Springs are the best evidence. By the Court: Sustained. By Mr. Jenner: We ask that the jury be admonished not to consider that part of the evidence. By the Court: Gentlemen of the Jury, the testimony of the witness as to what the records would show is not the best evidence, the records, themselves being the best testimony. You will not consider the last two answers of the witness."

The cross-examination by Mr. Childers of defendant's witness Coy Rosenthal is as follows:

"Q. Did you make any investigation of the case when it was filed? A. I started it. Q. Did you make a trip to Sulphur Springs? A. I did. Q. Did any information that you got down there through checking the records and talking to the sales manager of the barn or any other information that you gleaned from that investigation indicate that any cow had been bought by Arlis Campbell at that sale would correspond in size, color and weight and age with the cow that Tom Wilkins bought at the barn? By Mr. Jenner: We certainly object to what it indicates. By the Court: He could not testify to all that, it would be hearsay. By Mr. Childers: He is an officer.

"By Mr. Jenner: An officer can't tell it. By Mr. Childers: I will withdraw the question, I don't think it is pertinent to go into the law on the matter. By the Court: That question in its entirety is stricken, Gentlemen. You will disregard that."

There is no doubt but that the questions asked on cross-examination were improper and that the lower court acted properly in sustaining the objections interposed and in instructing the jury to disregard the answer in the instance involving the direct examination and to disregard the unanswered question involved in the cross-examination.

The question propounded to Deputy Wade concerning the records in question would have been proper where he examined the records if no objection had been interposed. There was nothing inherently wrong with the question except where a defendant interposes an objection such objection must be sustained as the records would be the best evidence.

The question asked witness Rosenthal on cross-examination not only involved his knowledge of records but involved an anticipated answer covering matters told him by others, and was inherently improper, but no answer was given by the witness.

We shall assume that the jury obeyed the admonishment of the court and disregarded the action of the special prosecutor complained of. But regardless of such assumption, the error now set up in petition in error was not set up as ground for new trial in motion filed in the lower court, and is for the first time urged in this court. Only those assignments of error preserved in a motion for new trial will be considered on appeal to this court unless the error is of a fundamental character. Washington v. State, 73 Okla. Cr. 81, 118 P. 2d 267.

Here, in each of the two instances, the court sustained the objections interposed by defendant, and in addition instructed the jury not to consider the matter. Was the error in propounding the question under the circumstances outlined so fundamental as to force this court to the conclusion that in spite of the court's admonition the jury did consider and give weight to this matter to the prejudice of the defendant, when we could more reasonably assume that the jury became prejudiced against defendant by reason of his own testimony involving the matters attempted to be inquired about, and failure to produce evidence apparently available that would have assured him victory? This thought, in view of defendant's testimony to the effect that one or two weeks prior to the Antlers sale he purchased the red white-face muley cow later sold to Tom Wilkins at the Antlers sale, through the sales barn at Sulphur, Texas, but that his wife had cleaned out his desk and burned the proof of such title. This was vital to his defense, and he could have obtained a certified copy of his title, or the records and evidence of the manager of the Sulphur Springs sale, or perhaps the evidence of the person selling the muley at Sulphur Springs, and thus we would believe, have cleared himself even though the cow had been stolen from Bernice Floyd.

By reason of the above, the judgment is affirmed.

BRETT, P. J., and JONES, J., concur.