**Elmer WILSON, Plaintiff in Error,**

v.

**The STATE of Oklahoma, Defendant in Error.**

**No. A–12370.**

Criminal Court of Appeals of Oklahoma.

Nov. 28, 1956.

Rehearing Denied Feb. 6, 1957.

Paul R. Haunstein, Enid, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

POWELL, Judge.

Elmer Wilson was tried before a jury and convicted in the Superior Court of Garfield County wherein he was charged with the crime of attempted extortion. He was sentenced to imprisonment in the county jail for a period of one year.

Defendant was prosecuted under 21 O.S. 1951 § 1487, headed: "Attempting to Extort Money" and reading:

"Every person who unsuccessfully attempts by means of any verbal threat such as is specified in the second section of this article [§ 1482] to extort money or other property from another is guilty of a misdemeanor."

And the following statutory provisions:

"Extortion is the obtaining of property from another with his consent, induced by a wrongful use of force or fear, or under color of official right." 21 O.S.1951 § 1481.

"Fear such as will constitute extortion, may be induced by a threat, either:

"1st. To do an unlawful injury to the person or property of the individual threatened, * * *." 21 O.S. 1951 § 1482.

21 O.S.1951 § 10 provides for the extent of punishment on conviction of misdemeanor.

The charging part of the amended information reads:

"* * * that on or about the 21 day of July, A.D. 1955, in said county of Garfield and State of Oklahoma, one Elmer Wilson did then and there unlawfully, wilfully and wrongfully attempt to extort from one Vernon Gau, the sum of Ten Thousand ($10,-000.00) Dollars with his, the said Vernon Gau's consent, said extortion attempting to be accomplished by putting the said Vernon Gau in fear of receiving great bodily harm at the hands of the said defendant and said defendant threatened to take the life of the said Vernon Gau contrary to the form of the statutes in such case made and provided and against the peace and dignity of the State of Oklahoma."

The argument presented by counsel in brief and on oral presentation for reversal of the conviction may be boiled down into five propositions.

Giving consideration to the first proposition, it is asserted that the trial court erred in overruling the demurrer to the amended information.

From a careful reading of the statutory provisions above quoted, and under which the prosecution was instituted, and of the charging part of the information as quoted, we do not discover that any essential element of the crime charged has been omitted. We think that the rule for testing the sufficiency of an information as against a demurrer as set out in State v. Tyler, 82 Okl.Cr. 112, 166 P.2d 1015, has been met. Paragraphs 3 and 4 of the syllabus read:

"An information which informs the accused of the offense with which he stands charged with such particularity as to enable him to prepare for his trial, and so defines and identifies the offense that, if convicted or acquitted, the accused will be able to defend himself against any subsequent prosecution for the same offense, will be sustained as against a demurrer.

"This court has been liberal in construing indictments and informations, and has often held that they were sufficient if the offense is charged in the language of the statute. This is especially true in misdemeanor cases."

It is next contended that the evidence is insufficient to sustain the verdict. We have read the more than three hundred pages of the record.

First to testify for the State was Dr. Vernon Gau, a doctor of osteopathy, with offices in Enid, known as the Gau Clinic. He testified that he had lived in Enid 12 years, was married and had three children,

ages two, five and seven; that he was acquainted with the defendant Elmer Wilson and with defendant's wife, Lila Wilson; that Mrs. Wilson had been a patient of his over a period of time, and on July 20, 1955 came to his office. Said he: "She was highly emotional, more or less unstable, very nervous." Witness said that Mrs. Wilson was in his office for about ten to fifteen minutes, and that he gave her an injection of ovarian hormone with 2,500 units of estrogen hormone. Witness testified that in the afternoon of July 21, 1955 Mrs. Wilson again came to his clinic, wanting something for her child. He prescribed for the child, and said that Mrs. Wilson was more settled, but he recommended that she continue to take her hormone injections. She was in the office of witness this time for five to ten minutes. Later on in the evening while witness was at home with his family and two friends who had been their dinner guests, he received a 'phone call from Mrs. Wilson, about 8:30 or 9:00 o'clock, and she told him, "I've got to see you tonight," and he advised her that he had company and could not see her. That she seemed highly excited and nervous on the telephone, and repeated that she had to see him, so he said, "Well, I'll see you then down at the office", but she said, "No, no, no, I can't meet you at the office." Witness said that he finally agreed to drive by his office and that Mrs. Wilson was to follow him out of town for a consultation. That he was apprehensive about such procedure, but that he knew his patient and her condition, and knew about her family troubles. Said he:

"And I figured I might be able to give her some kind of counsel that doctors do, and we always do. We have these patients all the time. We have to treat them for everything, not just physical ailments. So I drove by, and she honked, and I started—(I was coming by the hospital), and I just went down Broadway."

Witness said that he drove west past the Country Club road and stopped. He repeated that his reasons for seeing Mrs. Wilson were strictly professional. Witness further testified:

"A. It was dark, and a hot night. I don't—it don't recall to me. I stopped. I didn't think anything about it. I got out of my car, and was just in shirtsleeves, just the way I was sitting in the house, and she was driving up. I just stood in the middle of the road until her car stopped some thirty or forty feet probably from mine. So, I was in a hurry to get back to my company, and I walked down there and I said, 'Well, what did you want?' She said, 'I want to talk to you.' And I said, 'Well, which car do you want to sit in?' Common question, just something to say. She said, 'Well, let's sit in your car.'

"Q. Did you get up to her car, Doctor? A. Yes, I walked up pretty close to it. I didn't notice anything, I just—that was it.

"Q. All right, proceed. A. Well, she said, 'Let's sit in your car.' I turned back around and walked down and got in my car and sat down. She come along and come up to the right side of my car and she fooled around with the door, acted like she was having trouble opening the door, and before she ever got in my car, Mr. Wilson stuck a shotgun right through the open window right against my head, and the language he used, I am not accustomed to using. It was terrible.

"Q. All right, Doctor, you tell this court and jury what language Elmer Wilson used when he stuck that shotgun up to your head. A. Well, I am rather reluctant to use that.

"Q. Go ahead, just tell us. Don't bandy about it. A. Well, he had this shotgun sitting right there; he was shaking like a leaf; he was mad, and he called me a 'dirty sonofabitch doc-

tor and you and your dadgummed oil wells, you and your money, you sonof-abitch.' Of course at first I was shocked and scared to death. I knew, gollee—so he says, 'Get out of that car, you sonofabitch, don't you dare try to start it or I'll blow your head off'. Nothing I could do. I got out of the car, naturally. And he said, 'Don't you try to get around here', and he kept the gun right square at me all the time he was talking. In the mean-time, just as he was ordering me and all that out of the car, Mrs. Wilson was walking back of my car and hol-lered, 'Don't hurt him, honey, don't hurt him, honey; you promised not to hurt him.' Gollee, I knew then what the deal was. He said—

"Q. Now you go right ahead, how-ever embarrassing it is, and state exact-ly what you heard out there. A. He said, 'You dirty old slut, you sonofa-bitch you, you get back in that car, and if you don't do what I want you to do, I'm going to kill you too, you dirty old whore you', and then she went to that car. That was the last of Mrs. Wilson.

"Q. Doctor, did Mrs. Wilson ever get into your car at all? A. No, sir.

"Q. Did she ever get the door open —your door open? A. She got the door open, but she never got in.

"Q. Then what further conversa-tion was had out there between you and this defendant, if any? A. Well, I was just a little bit scared out there and I can't remember all of it, because the whole thing revolved around—he said, 'You've got money, you sonofa-bitch, and I've got you out here where I can prove you're out here with my wife.' He says, 'I'm going to get some of that', and he says, 'I'll tell you one thing, I know about your oil wells', which I have some small oil wells at Garber, which has nothing to do with it, but he said, 'I'll tell you one thing, this is going to cost you Ten Thousand Dollars, and you're going to have it in

my bank, it's the Central National Bank in Enid, Oklahoma, by Saturday morn-ing, deposited to my account.' Well, I felt a little relief when he started want-ing money. I knew he wasn't going to shoot me then; I didn't think at least. I told him, with the shotgun in my face, that I would absolutely not pay him one cent; that there was no way for me even to get Ten Thousand Dollars in the first place. He told me, 'You can borrow Ten Thousand Dollars,' and I told him, 'I am borrowed plumb to the hilt now', and that there is no way in God's green earth that I could ever give him Ten Thousand Dollars. He said, 'You've got to get it. I've got to have it, and you've got to get it.

"Q. He said he had to have it? A. Yes.

"Q. All right. A. 'Or', he said, 'If you don't I will kill you'. About the time this was all going on, I tried to back around away from this gun in me all the time, that made me nervous, and he kept backing, and he said, 'Don't you dare try to get away, or I'll kill you.' And he put a shell in the shotgun right in my face—it's a pump gun, and he ejected a shell right square in that bar-rell, as far as I'm concerned, and then there was a car coming from the east about that time, and I said, 'Elmer, I am going to get out of here there's no need of standing out here and cars com-ing and everything else, and you with a shotgun at me.' He said, 'You get in that car and try to start that', and he says, 'I'll kill you right here.' The car came all the way up with us and we are still down there in the middle of the road, and the car stopped. So I said, 'Elmer, I'll have to see you, and I'll see you about it', and that's all. And when that car stopped, I got in my car and took out and went home. And when I got home, I had an emergency and I didn't get back from that probably 'till 2:00 o'clock that morning. That was it."

Witness stated that he told his wife about the happenings testified to on the same night, and that his wife knew about the happenings when the defendant, Elmer Wilson, later on 'phoned her as to his version. Witness said that he also consulted with his attorney about the matter, and advised the county attorney as to the happenings. That on the Monday afternoon following his experience he noticed defendant sitting in a car parked next to his car back of his office; that this frightened him, and he 'phoned the county attorney, and the county attorney came over to the office of witness. This was about 4:00 p. m. and the county attorney accompanied witness out the back door of the building to the car where the defendant Wilson was sitting. Witness further testified:

"A. I said, 'Well, Wilson', I said, 'Now what is it that you want again?' And he says, 'You know', some more language—'what I want, you so and so', and I said, 'Just what is that?' and he said, 'I want that Ten Thousand Dollars.' And I said, 'Well, Wilson, I don't like guns to be held in my head, or anything about it, or any pointed at me, and', I said, 'I didn't appreciate that.' He said, 'Well, I should have killed you, you—', some more language—'and I would have, except you've got a wife and three little kids.' And then, after he had admitted the gun and so forth, why you asked Mr. Wilson—

"Q. Where was I during all this conversation? A. You were standing there right at my right side, right next to me.

"Q. How close were we to the car? A. Not two feet away from the window.

"Q. Whose car was it? A. Mr. Wilson's car.

\* \* \* \* \* \*

"Q. Did you see anyone else present? A. Just as we were talking, and before I finished talking to Wilson, I saw Mr. VanBoskirk come across the street and stand on the other side of the car with the window open.

"Q. Was that the first time you saw Deputy Sheriff Ray VanBoskirk on on that day? A. Yes, sir.

\* \* \* \* \* \*

"Q. Did I at any time step into the conversation and say anything? A. Yes, sir, you did. When he admitted that he wanted the Ten Thousand Dollars, and he said again that he should have killed me, that's when you said, 'Now, Mr. Wilson, I've heard enough, and I have a witness that you have done enough that I can send you to jail.' And Wilson argued about something, and you said that if he had an argument that he should get a lawyer and take it into court, but so far as you were concerned you already had enough that you'd heard, and a witness, enough to send him to jail if I wanted to, and you asked me if I wanted to.

"Q. Did I ask you at that time if you wanted to prefer charges, and if you did I would take him right up to jail right then? A. Yes, sir. That's right, sir.

"Q. Did you make any answer to that? A. Well, I told you I didn't want to prefer charges. There's a reason. Because—And if he would just leave me alone and not bother me nor call my wife and mess around, that I wouldn't bring these charges.

"Q. And you considered at that time not to file these charges? Why did you not want to file these charges? \* \* \* A. I had—The reason I didn't want to file charges is, that I didn't want to go through the embarrassment and the publicity that he is putting me through now, and dragging my wife and my profession and so forth into it, when it was all so uncalled for, and I didn't want to suffer the embarrassment that I am under through all of it.

"Q. All right, Doctor, did you have any further meeting with Mr. Wilson after this occasion? A. No, sir.

"Q. Mr. Wilson wasn't placed under arrest at that time, was he? A. No, sir.

"Q. Did I make some further statements to him in your presence and in his presence? A. You told him that irregardless of whether I filed on him or not, that if he bothered me, called my house, came in my office, or in any way bothered me that you would file on him immediately and throw him in jail, or bring charges, I don't remember."

Ray VanBoskirk, deputy sheriff, next testified for the State and said that on the afternoon of July 25, 1955 at the request of the county attorney he went to the Gau Clinic to make an investigation. That he went to the alley back of the Gau Clinic and parked back of a car he observed defendant sitting in. He saw Dr. Gau and the county attorney approach the Wilson car, and heard part of the conversation. Witness was asked to tell the court and jury just exactly what conversation he did hear.

"A. Well, when you first approached the car, you and Doc, he was asked, 'What's your purpose here?' And he said, 'Well, I came to have a settlement with Dr. Gau.' So he said, 'You didn't come up to your agreement, so I'm here to see you about it.' Doc said, 'What agreement?' 'Well', he said, 'You didn't come up with the money like you agreed, or put it in the bank', or something to that effect. And Dr. Gau stepped back, and after he started talking and threatening what he was going to do to him—he made several threats there—and I came a little closer to the car, and I didn't know what he had in the car, apparently he didn't have anything, he made no attempt to do anything. So after the argument got hotter, the county attorney, Mr. Pope, told him, said, 'Now you've done committed enough here and expressed yourself, that you should be throwed in jail'. Well, I was there to take him

to jail, and figured that's what we would do. So, Dr. Gau talked to the county attorney there and agreed not to, and he promised the two there that there would be nothing more said or done. In that event, I got in my car, the county attorney and I, and came back to the office.

"Q. Was any particular sum of money mentioned during the course of that conversation? A. Yes, it was mentioned several occasions, several times. Ten Thousand was to have been the amount that he was to have gotten.

"Q. And what were the nature of these threats that you heard Mr. Wilson make to Dr. Gau? A. Well, he called several names there.

"Q. You mean he cursed him? A. And pretty excited, yes."

William Melvin, officer, police department, Enid, testified that he had been a police officer at Enid for eight years; that he was a brother-in-law of the defendant Wilson; that on July 17, 1955 which was on Sunday, around 3 or 3:30 in the afternoon Elmer Wilson came to the police station where witness was a dispatcher. Said he:

"A. Mr. Wilson came to the office. The door is usually closed to the office there, and we have a window where they have access for information. Mr. Wilson first came to the office and said he would like to speak to me, and I asked him to come in and have a chair inside the office, and he came in and sat down. He said he had been cleaning up his restaurant that he run at that time over on West Main. And he wanted to know if I could help him out in any way, or how I would like to make a hundred dollars. I told him I was always interested in making money, as far as that goes, just depended on what I had to do. And he stated he had some family troubles, and first one thing and then another, and his wife had been running around

on him, and who it was, and he finally told me who it was. Said Dr. Gau, and he wanted to know if I could help him catch him some way. I told him that I didn't believe I could have anything to do with that, a man in my position, holding the job I did.

"Q. Did he give you any of the details as to what he wanted you to do to earn that hundred dollars? A. Not at that time, no, sir; not any full details.

"Q. He said he wanted you to help him catch him; is that what you said? A. That's correct.

"Q. And did he say what his plans were? A. No, except probably catch them on a country road or in the car somewhere.

"Q. And did he say what he was going to do when he caught them? A. * * * He stated that he thought he'd catch them and get some money, make some money, probably get Ten Thousand Dollars.

"Q. Did he mention the figure, $10,000, to you at that time? A. Yes, he did.

"Q. And he said that he thought he might get $10,000 out of it? A. That's correct.

"Q. Did he give any explanation to you why he wanted you in particular to go along? A. He stated something about the uniform would probably impress somebody.

"Q. He asked you to be in uniform, did he? A. Well, when I got off; yes, sir.

"Q. He suggested it then, that you be? A. That's correct.

"Q. You say when you got off. Just how did he go about planning this thing? A. Did he lay the groundwork there? A. No, he didn't lay the groundwork there at that time. He just thought perhaps that I could help, at that time.

"Q. But he did offer you a hundred dollars to participate in the matter? A. That's correct."

Witness further said that defendant said that Dr. Gau was the person he would catch with his wife; that defendant was to take his gun with him, a shotgun, and wanted witness to have his pistol on. Witness refused to aid the defendant, and did not see Wilson again until just before 2 o'clock on July 21, when defendant again contacted witness about going with him to catch Dr. Gau with the defendant's wife. Witness was asked:

"Did he say how he knew that they were going to be anywhere that he might catch them? A. Well, he said that he had talked to his wife and she was to make a call to Dr. Gau and make an appointment to see him on that afternoon."

Witness further said that after witness again refused to aid defendant that defendant said he would try to get his son-in-law, Gene Gant (husband of his stepdaughter), to help him.

Witness was asked if in the capacity of police dispatcher he received a report on the evening of July 21, 1955. He said:

"Approximately 9:00 P.M., or shortly after, I received a telephone call that in the 200 block, probably 222 South Jefferson, that a two-tone blue Oldsmobile, late model, or '55 model—usually late or '55 model is the way it was given—had stopped by a man that had taken a shotgun from the trunk and climbed into the back seat of the car and hid down, and the woman had driven the car off."

He further testified that he relayed this report to the on-coming shift, Capt. Beardsley.

Alicia Rodriguez testified that she lived at 222 South Jefferson, Enid, and at about 9 or 10 o'clock in the evening, sometime in the summer time in 1955, the exact day and month she could not recall, she with her husband and two renters who lived up-

stairs in their home, were sitting on her front porch. The renters were Shala Wilkinson and his wife, and also his brother Chalmer Wilkinson. That the Champlin swimming pool was located just across the street. Witness further testified:

"A. Well, we were sitting out there on the porch and we saw a car coming from the east, around the corner there, and it stopped in front of the house, across the street. And then there was another one in back of it, and they both stopped. We thought maybe they was going to change a tire, or something. I happened to look that way and so did the Wilkinsons, and we saw a man get out of the car and go around to the back of the car to the trunk and open the trunk and he took out what we thought was a gun, a shotgun. Then he got in the back of the car, and that's all I saw. He got in the back and then they left.

"Q. Could you tell who was driving the car? A. Well, it looked like a woman, but I couldn't be sure. I am not positive.

"Q. It looked like a woman to you? A. Yes, but I'm not sure.

"Q. And what direction did they leave? A. They left Main Street to the north.

"Q. They were traveling north on Jefferson Street? A. That's right. And that's all I saw.

"Q. And this car that was parked behind it, did they follow them also? A. Yes, they followed them."

Witness then said that the Wilkinson men got into their '49 Buick and left to follow the two cars.

The above concluded the evidence for the State. The court overruled a demurrer interposed on behalf of defendant, and properly so, in view of the evidence recited.

The defendant did not testify.

Earl Johndrow, Enid, brother-in-law of the defendant, his wife (who was a sister of defendant), and Mrs. W. E. Thomas, Covington, Oklahoma, another sister of defendant, were offered as witnesses to impeach the testimony of William Melvin, who had testified for the State.

Witness Earl Johndrow testified and was corroborated by his wife, and by Mrs. W. E. Thomas, to the effect that he had heard that William Melvin had been or was to be subpoenaed as a witness for the State in the case against Elmer Wilson, and that he talked the matter over with his wife and Mrs. Thomas, and decided to telephone Melvin; that he had an extension telephone in his home and the other parties were to listen in; and this was about February 9, 1956. Said he:

"A. Well, I asked him if he had been subpoenaed for the case, and I understood that he had been, and after I heard that I wanted to call him and talk to him and ask him about it because I had known him for quite some time, and I asked him about it, and he said, 'No', and he wouldn't talk about it, and I thought he thought I was trying to pull something on him. And after I talked to him a little bit, why he told me, he said, '*I don't know hardly anything about it.*' And after I talked to him a little while longer, he said, '*Why no, they wouldn't be calling me to testify for Dr. Gau.*' And that was about the extent of the conversation.

"Q. Did he tell you that he knew nothing that would help Dr. Gau's case? A. He told me he knew very little about the case at all.

"Q. And that Dr. Gau would not be using him in the case? A. *He acted like he thought that was plumb out of the question, Gau calling for him, because he was a brother-in-law to Elmer.*" (Emphasis supplied.)

It was shown by the testimony of Sheriff Lelon Coyle of Garfield County that on February 8, 1956 he served a copy of an order on Mr. Haustein, counsel for the defendant, notifying him that the judge

of the superior court had ordered that the name of William Melvin, among others, be endorsed on the information, as witnesses.

Lila Wilson next testified for the defendant. The court received in evidence as defendant's Exhibit 4 two discs, one played on both sides, and one partially on one side, being an interview of Lila Wilson by the county attorney following the arrest of her husband. While these records do not appear transcribed in the record, we have succeeded in having them played. Although defense counsel introduced the records in evidence, he did not ask that they be played for the benefit of the jury, and in fact said that he had not heard them played himself.

Lila Wilson testified that she had a married daughter by a previous marriage, the wife of Gene Gant; that she was married to defendant Elmer Wilson for fifteen years but at the time of the trial had been divorced from him. She said that Dr. Vernon Gau was her family physician for about five years; that she and the defendant had operated a cafe in Enid. She said that in about March, 1955 she and Dr. Gau became intimate; that in the afternoon of July 21, 1955 she took her little girl to the office of Dr. Gau to have him prescribe medicine; that at that time Dr. Gau told her to call him at his home after he got off from work so that he would have an excuse to get away, and that she did call him about 9 p.m. and they agreed to meet at the hospital [clinic]. She said that she 'phoned him from her home; that she thought her husband was in the bathroom but that he was apparently standing outside a window and heard her conversation, but did not let on that he did, but accompanied her back to town to their cafe as was the usual custom. That she went in and got something to drink and then went out, got in her car, drove to the Gau Clinic, honked her car horn and saw Dr. Gau get in his car and drive off, and she followed him. That when they got out in the country Dr. Gau stopped his car and she stopped back of him, and that Dr. Gau got out of his car, came back to her

car and kissed her and wanted to know whose car they should take and she suggested they go in his car; that they went and got in his car, and about that time her husband appeared and stuck a shotgun in the car. She was asked what happened then. Said she:

"A. Well, he cussed Dr. Gau, and told him to get out of the car. Dr. Gau turned around to me and said, *'I have been expecting this.'* We both got out of the car.

"Q. Did you get out, or fall out? A. Fell out, I imagine. Both of us was scared to death.

"Q. All right, tell what happened out there. A. Well, Dr. Gau begged for his life, and he told Elmer, he said, 'If you will forget this, I'll make it up to you.' And he pulled a black billfold or wallet, or something out of his pocket, and said, 'I will gladly settle something for you to forget this.'

"Q. All right, go ahead. A. He said, I can't afford to be ruined in this town, my home, and friends, and everybody.' He said, 'I'll gladly settle something for this.' So finally he named an amount of Ten Thousand Dollars. He said, 'I will write you a check for $10,000, and place it in the bank for you.'

"Q. Who said that? A. Dr. Gau.

"Q. Dr. Gau said that? A. Dr. Gau. He says, 'If you will forget the whole deal, that's what I'll do. I'll take it to the bank and put it in your name.' "

Witness said that defendant agreed to accept the money at the insistence of Dr. Gau. She said that Dr. Gau then got in his car and returned to town, and she and her husband returned to town in their car.

Witness denied that her husband demanded money of Dr. Gau or threatened him if he did not pay. She said that it was Dr. Gau who wanted to pay money to keep the affair quiet so he "would not be ruined in this town." She said that Ray

VanBoskirk and a highway patrolman arrested her over in Major County as a material witness and brought her to the county attorney's office at Enid and that she told him the same story that she was then telling, and which was recorded on defendant's Exhibit 4, and was confined to jail for a week until she could make bond. She reiterated that she did not know that her husband was in her car when she followed Dr. Gau out into the country. She denied that she let her husband out of the car to get the shotgun out of the trunk. She disclaimed framing up with the defendant to get Dr. Gau in a compromising situation.

The State produced two witnesses in rebuttal. William Melvin testified to the telephone call from Earl Johndrow. He said that at the time Johndrow called him he had not gotten a subpoena. He said he told Johndrow that he did not think he would be called on to testify for Dr. Gau, but witness admitted there had been intimation that he would be called on to testify for the State in a criminal case. He said that he left work at the police station Wednesday night, February 8, 1956 and became ill and did not go back to work until Sunday afternoon at 2 o'clock, when he found the subpoena to testify on behalf of the State of Oklahoma in the within criminal case, and not in a civil case. Witness denied that Mr. Johndrow quizzed him as to what he knew about the criminal case.

Gene Gant testified that he was 23 years of age and married to Mrs. Lila Wilson's daughter by a previous marriage to a Mr. Daniels; that witness was a painter but was having financial difficulties and worked some at the Wilson cafe. He testified that around 4 to 4:30 p. m. July 21, 1955 he arrived at the cafe and that his wife, Donna, was there as was her mother, Lila, and the defendant. He said that he had agreed with the defendant to be a witness against Dr. Gau for Elmer who was to catch the doctor and his wife out together. He said that he left the cafe about 8:30 to follow the Oldsmobile that Lila was driving; that defendant was in the car with his wife;

that Lila drove down around the Champlin swimming pool and stopped on Jefferson Street, and that: "Elmer got out of the car, opened the trunk, got an object out of the trunk, got in the back seat and Lila drove on out. I followed them."

Witness further testified that the "object" taken from the car trunk was a shotgun. Witness was then asked where he then went. Said he:

"A. I followed him up to Broadway, on past Broadway, around the block, and parked in front of the Gau Clinic, and I waited behind a good distance, and Lila Wilson went inside and came back out and they drove on back to the cafe, and I went on back to the cafe."

Witness further said that Lila then drove with the defendant back to their Coney Island Cafe and went inside and they said, "We will have to postpone it for a little while." He said they then left the cafe, took their children home and then returned to the cafe and that he looked after the cafe while they were gone. That Elmer said to him on return: "Okay, let's go", and that witness got in his car and went over as he had agreed to do and parked near the Gau Clinic back about half a block and then Lila drove by, apparently alone, as no one could be seen in her car but her. He said that he was waiting for Dr. Gau's car to take off, but never saw any car follow Lila and he then decided that she must be following a car and he commenced to look for her and drove out by the Oakwood Golf Course but never located Dr. Gau or Lila. He said that when Lila left the cafe he saw Elmer get in the car with her, but did not see him when she drove by the Gau Clinic.

Witness further said that when he saw defendant down near the Champlin swimming pool get the shotgun out of the trunk of his car, that as they were leaving he saw what he thought was a black Buick car attempt to follow them; that the car came from a house on the corner of Jefferson Street and that he drove up right behind Elmer's car to keep the Buick from

such position and he followed Lila on to the Gau Clinic, which was the first time for him.

Witness was cross-examined at length but stuck by his story. He said that he understood that he was to be a witness in a civil suit, that Elmer talked about suing Dr. Gau for $75,000.

■■ This closed the evidence and the court overruled a demurrer interposed by the defendant, and we think properly so, for in a long line of decisions we have held as reiterated in Campbell v. State, 95 Okl. Cr. 396, 247 P.2d 281, 282:

"This court will not reverse a case for insufficiency of the evidence unless it can say after a study of all the evidence, that there was no substantial evidence in the record upon which the verdict could be based.

"In considering the sufficiency of the evidence, the function of this court is limited to ascertaining whether there is a basis in the evidence on which the jury could reasonably conclude that the accused is guilty as charged."

■ The next proposition advanced is that the prosecuting witness, Dr. Vernon Gau, deputy sheriff Ray VanBoskirk, and county attorney Dennis Pope were accessories and principals to the crime charged, and that in order to sustain the conviction of defendant their testimony should have been corroborated by separate and independent testimony.

The above proposition arises out of the testimony of the witnesses in question as to the happenings back of the Gau Clinic on Monday afternoon, July 25, 1955, when county attorney Pope accompanied Dr. Gau to his car where the defendant was found waiting in his own car parked next to that of Dr. Gau. This evidence has already been detailed. At the time counsel interposed an objection on the ground that: "It doesn't tend to prove nor disprove any issue in this case,—and it shows that if there was a crime committed out there, that they were compounding a felony."

This assertion would admit for the purpose of argument that if the evidence of the witnesses were taken as true that defendant would be guilty of extortion, a felony, but if so, the witnesses (by fact that defendant was not immediately arrested but was let go though threatened with arrest if he proceeded in any way against the prosecuting witness, Dr. Gau) were guilty of compounding a felony. But the charge was attempted extortion, a misdemeanor.

Clearly the county attorney, from the evidence, was attempting at the behest and plea of Dr. Gau, to save Gau and his family from the embarrassment of what undoubtedly would be a sensational and seamy case. However, there was evidence that defendant had been trying to get evidence for a civil suit against Dr. Gau, but finally resorted to an attempt to obtain money at the point of a shotgun. There is no evidence that the county attorney at the time was conscious of the civil suit feature or was consciously trying to forestall such a suit, though he did tell the defendant to consult an attorney, which would presumably be to protect any rights he might have.

In the rush of a sudden call the county attorney did not use sound judgment in the admonition he gave defendant and should have caused his arrest on the spot or as soon as he could have prepared a complaint. If he had decided not to file charges by reason of the nature of the case and for the laudable purpose of warding off possible family embarrassment and perhaps more serious developments among the parties involved, he should have made it clear that the prosecution was held in abeyance so long as defendant refrained from a breach of the peace by threats against Dr. Gau or members of his family or by actual assault upon him. It should have been made clear that the postponement or abandonment of prosecution for the acts of July 21, 1955 had nothing to do with any rights, if any, to a civil action of defendant against the prosecuting witness for matters arising prior to that date. No set of circumstances

# 730

that happened on July 21, 1955 are claimed that would give rise to a civil suit.

This lengthy dissertation is made because the defendant points out that though the charge for which he is prosecuted was the result of happenings of July 21, 1955, that the prosecution was not actually commenced until February 2, 1956, which was two days after defendant had filed a civil suit against Dr. Gau for alienation of his wife's affections. But, as indicated, we are convinced from the record that the county attorney acted in good faith. Defendant's wrongdoing brought out in the evidence recited herein could not foreclose him from maintaining a civil suit if he had evidence to support his petition.

 There is absolutely no evidence in this case and it was not even alleged anywhere that the defendant caught his wife and Dr. Gau committing any crime and agreed for a money consideration to refrain from prosecuting. The defendant is not being prosecuted for compounding a crime under 21 O.S.1951, § 543, but for attempted extortion. (See 21 O.S.1951 §§ 1481, 1482, and 1487.) These are separate and distinct crimes. For an illustration of this principle see Finkelstein v. State, 68 Okl.Cr. 341, 99 P.2d 167. Appellant does not cite any statute or decision requiring corroboration of the testimony of the prosecuting witness in an attempted extortion case with facts as in this case. To require corroboration there would have to be evidence of conspiracy or that the prosecuting witness aided or assisted the defendant in the commission of the crime charged, which clearly could not be in the within case. Therefore, the prosecuting witness could not be an accomplice, which would be necessary in order that his testimony be corroborated. See Wallis v. State, 49 Okl.Cr. 58, 292 P. 1056, 1057, where this court held:

"Knowledge that a crime has been committed and concealment of such knowledge does not make one an accomplice, unless he aided or participated in the offense."

While we are in this case considering a misdemeanor, to prevent confusion, it might be well at this point to call attention to the fact that by statutory provision the distinction between an accessory before the fact and a principal, and between principals in the first and second degree, in cases of felony, is abrogated, and all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, must be prosecuted, tried and punished as principals. See 22 O.S.1951 § 432.

We have next for consideration whether the happenings in the Gau Clinic parking yard, which we have heretofore recited, would be sufficient to make Dr. Gau and the deputy sheriff accessories after the fact, so as to require that their testimony be corroborated.

 In this connection see 21 O.S.1951 § 173, defining "accessories", as follows:

"All persons who, after the commission of any felony, conceal or aid the offender, with knowledge that he has committed a felony, and with intent that he may avoid or escape from arrest, trial, conviction, or punishment, are accessories."

The above statute was construed by this court in Vann v. State, 21 Okl.Cr. 298, 303, 207 P. 102, 103. In the body of the opinion we said:

"All persons who, after the commission of the felony, conceal or aid the offender, are accessories. From this it will be seen that an accessory after the fact, the only kind known under our law, is not an accomplice nor a coconspirator. One indicted for the crime of robbery as a principal cannot be convicted of the offense charged in the indictment if the evidence shows that he was only an accessory after the fact. [Citing cases.]"

We conclude, as contended by the State, that Section 173 supra, applies only in cases where a person conceals or aids the offender

"after the commission of any felony", for as this court said in Sturgis v. State, 2 Okl. Cr. 362, 102 P. 57, syllabus 4(d):

"There is no such thing in this state, in misdemeanors, as accessories after the commission of the offense."

 In State v. Phillips, 18 S.D. 1, 98 N.W. 171, 172, the South Dakota Court said:

"Rev.Cr.Code, § 364, providing that a conviction cannot be had on the uncorroborated testimony of an accomplice does not apply to accessories after the fact."

We therefore hold that the trial court did not commit reversible error in refusing to submit to the jury the question of whether the prosecuting witness was an accomplice to the crime of attempted extortion, and if the jury should so find, then his testimony would have to be corroborated by independent evidence before they would be warranted in finding the defendant guilty.

Counsel contends that the trial court erred in admitting the testimony of State's witness Alicia Rodriguez over the objection and exception of defendant. Her testimony likewise has already been summarized. We note that at the end, counsel for the defendant interposed an objection on the ground that the testimony of witness did not identify any of the parties in the cars, or connect defendant with the crime charged, and did not tend to prove or disprove any issue in the case, and was highly prejudicial to the defendant, and moved for a mistrial; all of which was overruled with an exception noted.

 It is apparent that the testimony of Mrs. Rodriguez was admitted under condition that the prosecution would have opportunity to connect it up by other evidence.

Standing alone, it would be inadmissible. But in view of the evidence of officer William Melvin as to the police dispatch the night of the crime charged, and of Gene Gant, defendant's son-in-law, the evidence stands unrefuted that defendant did get a shotgun from his Oldsmobile driven by his wife, on the evening of July 21, 1955, near the Champlin swimming pool at Enid, and across the street from the corner house on Jefferson Street where Mrs. Rodriguez was shown to have lived. Thus the indefiniteness of the testimony of Mrs. Rodriguez as to day and month and identification as to the woman driving the car and the man who obtained the gun, were supplied by the testimony of witness Gant, as well as that of William Melvin concerning the police dispatch. It is true that Gant's testimony was in rebuttal, but it concerned rebuttal of material matters testified to by Lila Wilson, witness for the defense, was proper rebuttal, and in view of the developments of the evidence as a whole, any error in failure to strike the evidence of this witness at the close of the State's direct evidence was cured by subsequent developments, and the error was harmless.

 It is finally argued by counsel that the trial court "did not permit the defendant to introduce any evidence of the clandestine love affair which existed between Vernon Gau and the defendant's wife Lila Wilson, for a period of over two years, all of which leads up to the events which occurred on July 21, 1955."

This proposition is not meritorious for the simple reason, if true, the same would not have constituted a valid defense to the crime charged.

For the reasons stated, the judgment appealed from must be, and is affirmed.

JONES, P. J., and BRETT, J., concur.